MICHAEL PHELAN *VS.* MAY DEPARTMENT STORES COMPANY & others.[1]

Suffolk. October 6, 2004. - December 16, 2004.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Practice, Civil,* Judgment notwithstanding verdict. *Libel and Slander.*

In a civil action brought by a plaintiff against his former employer and two of his supervisors for false imprisonment and defamation, the judge did not err in granting judgment notwithstanding the verdict on the defamation claim in favor of the defendants, where the defendants' conduct in keeping and escorting the plaintiff under guard did not convey a clear and unambiguous false statement about the plaintiff, and where the plaintiff failed to produce evidence that a reasonable third person observing that conduct would have understood it to be defamatory. [55-59]

CIVIL ACTION commenced in the Superior Court Department on September 14, 1998.

The case was tried before *Elizabeth M. Fahey*, J., and a motion for judgment notwithstanding the verdict was heard by her.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Jean A. Musiker* (*Michael S. Appel* with her) for the defendants.

*Richard D. Glovsky* (*Marni Caputo* with him) for the plaintiff.

*Robert P. Morris, Robert P. Joy, Ben Robbins, & Andrew Grainger*, for Associated Industries of Massachusetts & another, amici curiae, submitted a brief.

SPINA, J. This case arises from a July 10, 1998, investigation by Filene's, a division of the May Department Stores Company (May), into allegations that Michael Phelan was attempting to hide significant accounting discrepancies from his superiors. Phelan brought an action against May, Michael Geraghty (Filene's chief financial officer), and Donald Lane (Filene's

---

[1]Michael Geraghty and Donald Lane.

controller) (collectively, the defendants), alleging that their conduct during the investigation had constituted false imprisonment and defamation. A jury found in favor of Phelan on both claims and awarded him damages of $1,500 for false imprisonment and $75,000 for defamation. With respect to Phelan's defamation claim, the defendants moved for judgment notwithstanding the verdict (judgment n.o.v.), contending that Phelan had produced insufficient evidence on which a jury reasonably could have found either (1) the conduct alleged had defamatory significance to those witnessing it; or (2) the defendants had lost their conditional privilege to publish arguably defamatory material about Phelan.[2] The defendants also moved for a new trial with respect to the defamation claim. On December 21, 2001, a judge in the Superior Court allowed the motion for judgment n.o.v., doubting that Phelan had set forth sufficient evidence of publication and concluding that he had failed to overcome the defendants' conditional privilege. The judge denied the defendants' motion for a new trial.

Phelan appealed from the judgment n.o.v., and the Appeals Court reversed, concluding that the motion judge had erred by substituting her judgment for that of the jury. See *Phelan* v. *May Dep't Stores Co.*, 60 Mass. App. Ct. 843 (2004). We allowed the defendants' application for further appellate review and now consider whether (1) in the absence of interpretive testimony from witnesses, the evidence at trial was insufficient to prove publication of any particular statement about Phelan; and (2) the evidence was insufficient to demonstrate that the defendants had acted recklessly or maliciously, thereby losing their conditional privilege to publish a defamatory statement about Phelan. For the reasons that follow, we affirm.[3]

Based on the testimony at trial, the jury could have found the following facts. Phelan was employed as assistant director of accounts payable for Filene's where, among other tasks, he was responsible for managing "vendor violations" and the related budget. Vendor violations occurred when vendors failed to

---

[2]The defendants did not appeal from the jury's verdict on the false imprisonment claim.

[3]We acknowledge the amicus brief filed by Associated Industries of Massachusetts and New England Legal Foundation.

comply with Filene's shipping or purchase order requirements, and Filene's imposed a charge on them to cover the additional costs. To challenge an imposed charge, a vendor would submit to Filene's a "vendor violations package," addressing why the charge was unjustified and requesting a refund. This package would be processed by Phelan's department, and if it was determined that the charge had been improperly assessed, the vendor would receive a repayment.

In 1997, Geraghty directed Phelan to pay "prior year invoices" (PYIs) from the vendor violations budget, notwithstanding the fact that severe fiscal problems had arisen in the past from this practice. Phelan and his direct supervisor, Catherine Rooney, warned Geraghty and Lane that this practice was ill advised because it hindered their ability to make timely repayments to deserving vendors and to meet budgetary goals. Nonetheless, Phelan was not instructed to stop this practice.

During this time, unbeknownst to Phelan, a backlog of vendor violations packages had begun to accumulate in the hands of Phelan's subordinate, Geoffrey Meade, who was in charge of evaluating these packages. In early July, 1998, Meade finally told Phelan about the backlog, indicating that the amount due to vendors was approximately $200,000. Phelan and Rooney promptly notified their supervisor, Michael Basler, who was Filene's assistant controller. As it turned out, the problem was significantly greater than Phelan had been led to believe; Meade reported to Basler that the backlogs and unpaid PYIs totaled $491,995. Meade attempted to shred his backlog of vendor violations packages, but the documents were ultimately retrieved.

At this juncture, Geraghty, Lane, and Basler decided to conduct an investigation and audit of the vendor violations program. On the morning of July 10, 1998, Lane interviewed Phelan as to alleged accounting irregularities and then directed him to Basler's office. Lane instructed a Filene's security officer, Johnny Guante, to guard Phelan, purportedly so that Phelan would not "influence" or "intimidate" his subordinates, who were being questioned as part of the investigation. Phelan was not permitted to use the telephone. Throughout the day, Guante relocated Phelan to various available offices and confer-

ence rooms, escorted him to the restroom, and accompanied him to the cafeteria. Coworkers did not speak with Phelan as he was moving about the building with Guante. Although Guante did not wear a badge or other insignia that identified him as a security guard, and did not carry a weapon or handcuffs, he did wear dark trousers, a shirt, a tie, and a blazer that Filene's had issued to him and that was similar to the clothing worn by other security guards in the store. Phelan felt embarrassed and humiliated because of his observation that, everywhere they went, coworkers were staring at him while he was in the company of security personnel. At the end of the day, Phelan was returned to Basler's office, was informed that he was being suspended, and was escorted out of the building by another Filene's executive. Phelan's employment with Filene's subsequently was terminated.

When considering a motion for judgment n.o.v., "the judge's task, 'taking into account all the evidence in its aspect most favorable to the plaintiff, [is] to determine whether, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, the jury reasonably could return a verdict for the plaintiff.' " *Tosti* v. *Ayik*, 394 Mass. 482, 494 (1985), quoting *Rubel* v. *Hayden, Harding & Buchanan, Inc.*, 15 Mass. App. Ct. 252, 254 (1983). See *Cambridgeport Sav. Bank* v. *Boersner*, 413 Mass. 432, 438 (1992). The judge will consider whether "anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn" in favor of the nonmoving party. *Poirier* v. *Plymouth*, 374 Mass. 206, 212 (1978), quoting *Raunela* v. *Hertz Corp.*, 361 Mass. 341, 343 (1972). To be reasonable, the inference "must be based on probabilities rather than possibilities and cannot be the result of mere speculation and conjecture." *McEvoy Travel Bur., Inc.* v. *Norton Co.*, 408 Mass. 704, 706-707 n.3 (1990), quoting *McNamara* v. *Honeyman*, 406 Mass. 43, 45-46 (1989). When reviewing a judgment n.o.v., this court applies the same standard as the motion judge. See *Kattar* v. *Demoulas*, 433 Mass. 1, 8 n.5 (2000).

To prevail on his defamation claim, Phelan had to establish

that the defendants published a false statement[4] about him to a third party that either caused him economic loss or was of the type that is actionable without proof of economic loss. See *White* v. *Blue Cross & Blue Shield of Mass., Inc.*, 442 Mass. 64, 66 (2004); *Eyal* v. *Helen Broadcasting Corp.*, 411 Mass. 426, 429-430 (1991). See also Restatement (Second) of Torts § 558 (1977). A false statement that "would tend to hold the plaintiff up to scorn, hatred, ridicule or contempt, in the minds of any considerable and respectable segment in the community," would be considered defamatory, *Stone* v. *Essex County Newspapers, Inc.*, 367 Mass. 849, 853 (1975), and the imputation of a crime is defamatory per se, requiring no proof of special damages. See *Lynch* v. *Lyons*, 303 Mass. 116, 118-119 (1939). The element of publication is satisfied where the defamatory communication is transmitted to even one person other than the plaintiff. See *Brauer* v. *Globe Newspaper Co.*, 351 Mass. 53, 56 (1966); Restatement (Second) of Torts, *supra* at § 577. Contrast *Economopoulos* v. *A. G. Pollard Co.*, 218 Mass. 294, 297 (1914) (no publication where defamatory words, spoken in presence of others, uttered in foreign language and only understood by plaintiff).

The defendants contend that they were properly entitled to judgment n.o.v. on Phelan's defamation claim because their conduct did not convey a clear and unambiguous false statement about Phelan and, in the absence of evidence that an observer interpreted the defendants' conduct as conveying such a meaning, Phelan has failed to establish defamatory publication. We agree.

A threshold issue in a defamation action, whether a communication is reasonably susceptible of a defamatory meaning, is a question of law for the court. See *Foley* v. *Lowell Sun Publ. Co.*, 404 Mass. 9, 11 (1989); *Jones* v. *Taibbi*, 400 Mass. 786, 791-792 (1987). See also Restatement (Second) of Torts, *supra* at § 614 (court decides whether communication is capable of

---

[4]"By statute, Massachusetts permits a plaintiff to recover for a truthful defamatory statement published in writing (or its equivalent) with actual malice, G. L. c. 231, § 92, except as confined by the requirements of the First Amendment to the United States Constitution." *White* v. *Blue Cross & Blue Shield of Mass., Inc.*, 442 Mass. 64, 66 n.4 (2004). See *Ravnikar* v. *Bogojavlensky*, 438 Mass. 627, 629 n.3 (2003).

particular meaning and whether such meaning is defamatory). However, "[w]here the communication is susceptible of both a defamatory and nondefamatory meaning, a question of fact exists for the jury." *Jones* v. *Taibbi, supra* at 792. See Restatement (Second) of Torts, *supra* (jury decides "whether a communication, capable of a defamatory meaning, was so understood by its recipient"). In the context of determining whether articles published in a newspaper were defamatory to particular businesses, we stated that "an objective test — i.e., inquiry into a reasonable recipient's understanding of the words rather than the speaker's intent — has been used over the years to prove that words are defamatory" and that they concerned the plaintiff. *New England Tractor-Trailer Training of Conn., Inc.* v. *Globe Newspaper Co.*, 395 Mass. 471, 479-480 (1985). Cf. *Economopoulos* v. *A. G. Pollard Co., supra* at 297.

When assessing the import of physical acts, which are at issue here, rather than written or spoken words, this objective test is equally applicable. Although not explicitly recognized in prior Massachusetts case law, we conclude that defamatory publication *may* result from the physical actions of a defendant, in the absence of written or spoken communication.[5] See Restatement (Second) of Torts, *supra* at § 559 comment a, at 156 ("The word 'communication' is used to denote the fact that one person has brought an idea to the perception of another"); *id.* at § 563 comment a, at 162 (meaning of communication, "whether by written or spoken words or otherwise," is that which recipient understands it to convey); *id.* at § 565 comment a, at 170 (particular act may fall within definition of defamatory communication); *id.* at § 568 comment d, at 180 (publication of defamatory matter may be made by conduct and may be treated as libel, rather than slander). See also *Jorgensen* v. *Massachusetts Port Auth.*, 905 F.2d 515, 520 (1st Cir. 1990) (defamation requires "a communication, defined as conduct that brings an idea to the perception of others"); *Jimenez-Nieves* v. *United States*, 682 F.2d 1, 6 (1st Cir. 1982) (activity counts as

---

[5]For a comprehensive discussion of the theories of defamation by conduct, primarily in the employment context, and their treatment in various States, see Note, Beyond Words: The Potential Expansion of Defamation by Conduct in Massachusetts, 83 B.U. L. Rev. 619 (2003).

"communication" if it conveys idea to third person); *Simas* v. *First Citizens' Fed. Credit Union*, 63 F. Supp. 2d 110, 116 (D. Mass. 1999) ("an individual's actions, separate from any written or spoken statements, may be sufficient grounds for a jury to find a cause of action [for defamation]"); *Petsch-Schmid* v. *Boston Edison Co.*, 914 F. Supp. 697, 705 (D. Mass. 1996), aff'd, 108 F.3d 328 (1st Cir. 1997) (where supervisor raised voice to employee while escorting her from building after suspension, "it is possible that the escort may have been conducted in such a manner as to communicate a defamatory statement to other employees about the plaintiff").

Even viewing the evidence in the light most favorable to Phelan, as we must, the defendants' conduct was ambiguous and open to various interpretations. The actions of Guante in escorting Phelan about the office on July 10, and in relocating him to various conference rooms, did not have a specific, obvious meaning and did not necessarily convey that Phelan had engaged in criminal wrongdoing. There was no chasing, grabbing, restraining, or searching such as would have conveyed a clear and commonly understood meaning. From the mere fact that he was being accompanied by a security guard, observers could have thought, for example, that the defendants were sequestering Phelan so that he could not communicate with others, or so that he could provide confidential assistance with their investigation. Where Guante's communication, through physical action, was ambiguous, it was for the jury to decide whether such communication was understood by Phelan's coworkers as having a defamatory meaning.

Phelan had the burden of proving that a reasonable third person observing Guante's conduct would have understood it to be defamatory. See *Leonard* v. *Allen, supra* at 244-245. See also Restatement (Second) of Torts, *supra* at § 613 comments c and d, at 308 (plaintiff must convince jury that communication was understood as defamatory by third person). Cf. *Sharratt* v. *Housing Innovations, Inc.*, 365 Mass. 141, 144-145 (1974) (statement not defamatory on face may acquire defamatory meaning when audience presented with attendant circumstances). Contrast *Economopoulos* v. *A. G. Pollard Co., supra* at 297 (no publication, and thus no cause of action for defamation, where

purported defamatory meaning only understood by plaintiff). Phelan presented no such evidence to satisfy his burden of proof. He testified that he was embarrassed and humiliated by the defendants because other employees stared at him in the company of Guante. However, Phelan's own belief that others viewed him in a defamatory light, without more, was insufficient to establish defamatory publication. In other words, Phelan was not competent to testify as to his coworkers' interpretation of Guante's actions and whether, as a result of what they saw, they viewed Phelan with scorn, hatred, ridicule, or contempt. Publication to Phelan cannot be substituted for publication to a third party. Cf. *Economopoulos* v. *A. G. Pollard Co.*, *supra*. To satisfy his burden of proof, Phelan needed to present testimony from at least one coworker who observed Guante's actions and interpreted such actions as defamatory. Cf. *Leonard* v. *Allen*, 11 Cush. 241, 244 (1853) (where purported slander made by expressions and gestures, and not solely by words, it was necessary to inquire of witnesses what they understood defendant to mean both as to person intended and charge made against him). Because he failed to do so, we conclude that he did not establish the essential elements of defamation.

In light of our conclusion, we need not consider whether the defendants' conduct was protected by an employer's conditional privilege to publish defamatory material where the publication is reasonably necessary to the protection or furtherance of a legitimate business interest. See *Bratt* v. *International Business Machs. Corp.*, 392 Mass. 508, 512-513 (1984).

The judgment notwithstanding the verdict is affirmed.

*So ordered.*