Aaron GREENSPAN, Plaintiff,

v.

RANDOM HOUSE, INC., Mezco, Inc., Benjamin Mezrich, Columbia Pictures Industries, Inc. a/k/a Sony Pictures a/k/a Columbia Tristar Motion Picture Group, Defendants.

---

**Civil Action No. 11–12000–RBC.**[1]

United States District Court,
D. Massachusetts.

May 9, 2012.

---

1. With the parties' consent, this case was reassigned to the undersigned for all purposes, including trial and the entry of judgment, pursuant to 28 U.S.C. § 636(c).

Aaron Greenspan, Palo Alto, CA, pro se.

Marvin N. Cable, Law Offices of Marvin Cable, Northampton, MA, for Plaintiff.

Bradley H. Ellis, Stephen G. Contopulos, Sidley Austin LLP, Los Angeles, CA, Gordon P. Katz, Benjamin M. McGovern, Holland & Knight, LLP, Dustin F. Hecker, Posternak, Blankstein & Lund, Boston, MA, Kevin T. Baine, Megan A. Hughes, Williams & Connolly LLP, Washington, DC, for Defendants.

### MEMORANDUM AND ORDER ON MOTION OF RANDOM HOUSE, INC., MEZCO, INC., AND BENJAMIN MEZRICH TO DISMISS WITH PREJUDICE (# 17) AND DEFENDANT COLUMBIA PICTURES INDUSTRIES, INC.'S MOTION TO DISMISS COMPLAINT (# 22)

ROBERT B. COLLINGS, United States Magistrate Judge.

### I. Introduction

Events anent the creation of Facebook in 2003–2004 and the website's subsequent development have been the subject of a great deal of written commentary, a movie and substantial litigation. This case, filed seven years after Facebook was launched, is perhaps the latest example of this phenomenon.

On November 18, 2011, *pro se* plaintiff Aaron Greenspan ("Greenspan") filed a five-count complaint seeking damages and injunctive relief against defendants Random House, Inc. ("Random House"), Mezco, Inc. ("Mezco"), Benjamin Mezrich ("Mezrich"), and Columbia Pictures Industries, Inc. a/k/a Sony Pictures a/k/a Columbia Tristar Motion Picture Group (collectively, "Columbia Pictures"). Greenspan,

a 2004 graduate of Harvard University, is the author of a book entitled *Authoritas: One Student's Harvard Admissions and the Founding of the Facebook Era* ("*Authoritas*"). (# 1 ¶¶ 16, 26) Random House, a New York corporation, is the publisher of a book, *The Accidental Billionaires: The Founding of Facebook: A Tale of Sex, Money, Genius, and Betrayal* ("*The Accidental Billionaires*"), authored by Mezrich [2]. (# 1 ¶¶ 2, 4, 17) According to the allegations of the complaint, The Accidental *Billionaires* "is an unauthorized derivative of [Greenspan's] non-fiction book *Authoritas*." (# 1 ¶ 2)

Mezco [3] and Random House purportedly "sold derivative rights, including motion picture rights, in *The Accidental Billionaires* to" Columbia Pictures, a Delaware corporation registered to do business in Massachusetts. (# 1 ¶¶ 3, 20) Columbia Pictures made and released a movie, *The Social Network* ("The Film"), based on *The Accidental Billionaires*. (# 1 ¶ 3)

As a result of the defendants' actions, the plaintiff has advanced claims of copyright infringement in violation of the United States Copyright Act, 17 U.S.C. §§ 101 *et seq.* (Count I, II, III), unfair competition and false advertising in violation of section 42(a) of the Lanham Act, 15 U.S.C. § 1125(a) (Count IV), and a state law claim of defamation (Count V).

Defendants Mezrich, Mezco, and Random House have moved to dismiss with prejudice all counts of the complaint pursuant to Fed.R.Civ.P. 12(b)(6) (# 17), and have filed a memorandum of law (# 18) and an affidavit (# 19) in support of their motion. Defendant Columbia Pictures separately has filed a Rule 12(b)(6) motion (# 22) together with a memorandum of law (# 23) and an affidavit (# 24) in support thereof. The plaintiff has submitted a combined response to the defendants' dispositive motions (# 29) along with a memorandum in law (# 29) and certain exhibits [4] (# 29 Exh. A–E). With leave having been granted (*see* Electronic Order entered 02/13/12), both Columbia Pictures and Mezrich, Mezco and Random House filed reply briefs. (# # 39, 40) Oral argument was heard on February 16, 2012, and at this juncture the motions to dismiss are ready for decision.

## II. The Facts

According to the allegations of the complaint, while an undergraduate at Harvard University in 2003, Greenspan developed an original website called houseSYSTEM with a component website called The Facebook. (# 1 ¶ 23) Thereafter plaintiff's classmate, Mark Zuckerberg ("Zuckerberg"), developed a website, now called Facebook, Inc. ("Facebook"), which incorporated some of Greenspan's ideas. (# 1 ¶ 23) A resounding success after its launch, Zuckerberg's Facebook has hundreds of millions of users worldwide. (# 1 ¶ 24) Greenspan alleges that "Zuckerberg systemically excluded Plaintiff from any recognition for contributions to his success and from the company Plaintiff had indirectly helped create." (# 1 ¶ 25) Moreover, the plaintiff's public opposition to Zuckerberg's failure to address privacy and security problems on

---

2. Mezrich is a Massachusetts resident who is alleged to be "a contractor or other agent of Random House, and is an owner and/or agent of" Mezco. (# 1 ¶ 19)

3. A Massachusetts corporation, Mezco is alleged to be a listed owner of the copyrights in *The Accidental Billionaires*. (# 1 ¶ 18)

4. Defendants Mezrich, Mezco and Random House have filed a motion to strike the exhibits proffered by the plaintiff (# 33) to which Greenspan has filed a response (# 34).

Facebook purportedly impaired Greenspan's own career prospects. (# 1 ¶ 25)

In order to clear the controversy surrounding the origins of Facebook, Greenspan wrote his memoir, *Authoritas*. (# 1 ¶ 26) An attempt to have *Authoritas* published by the Doubleday division of Random House was rejected. (# 1 ¶ 28) On June 1, 2008, Greenspan self-published *Authoritas;* a copyright on the book had been registered in the plaintiff's name with the United States Copyright Office on April 13, 2008. (# 1 ¶ 29)

Google, Inc. ("Google") refused to advertise *Authoritas* because the subtitle included the word "Facebook," which Google considered to be a trademark. (# 1 ¶ 30) Greenspan responded by petitioning the United States Trademark Office to cancel two of Facebook's registered trademarks for the term FACEBOOK. (# 1 ¶ 30) In May of 2009, Greenspan, his company Think Computer Corporation, Zuckerberg and Facebook reached a confidential settlement. (# 1 ¶ 31)

At the end of July, 2008, defendant Mezrich contacted Greenspan seeking the plaintiff's assistance on a book about the origins of Facebook. (# 1 ¶ 32) The plaintiff declined to help Mezrich, but instead referred him to the website for *Authoritas*. (# 1 ¶ 33) On July 14, 2009, Random House published the book penned by Mezrich entitled *The Accidental Billionaires*. (# 1 ¶ 36) *Authoritas* was listed as a secondary source in *The Accidental Billionaires*. (# 1 ¶ 38) Columbia Pictures produced the Film based on *The Accidental Billionaires* and released it on October 1, 2010. (# 1 ¶¶ 55, 61)

All three works, *Authoritas, The Accidental Billionaires* and the Film, detail certain meetings between Lawrence Summers, former president of Harvard University, and Harvard students. (# 1 ¶ 62) In *Authoritas* the meeting described in-volved the plaintiff while in *The Accidental Billionaires* and the Film, the students involved were Cameron and Tyler Winklevoss. (# 1 ¶ 62)

Further facts shall be added during the course of the discussion as necessary.

### III. The Standard of Review

A Rule 12(b)(6) motion to dismiss challenges a party's complaint for failing to state a claim. In deciding such a motion, a court must " 'accept as true all well-pleaded facts set forth in the complaint and draw all reasonable inferences therefrom in the pleader's favor.' " *Haley v. City of Boston,* 657 F.3d 39, 46 (1 Cir., 2011) (quoting *Artuso v. Vertex Pharm., Inc.,* 637 F.3d 1, 5 (1 Cir., 2011)). "[T]he complaint must 'contain sufficient factual matter . . . to state a claim to relief that is plausible on its face.' " *Haley,* 657 F.3d at 46 (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (further internal quotations and citation omitted) (alteration in original)). When considering a motion to dismiss, a court "may augment these facts and inferences with data points gleaned from documents incorporated into the complaint, matters of public record, and facts susceptible to judicial notice." *Haley,* 657 F.3d at 46 (citing *In re Colonial Mortg. Bankers Corp.,* 324 F.3d 12, 15 (1 Cir., 2003)).

### IV. Discussion

#### A. Copyright Infringement

The first three counts of the complaint, claims for copyright infringement, contributory copyright infringement, and vicarious copyright infringement respectively, shall be addressed in tandem.

■ To succeed on a claim of copyright infringement Greenspan must show that (1) he had "ownership of a valid copyright," and (2) the defendants copied "constituent elements of the work that are

original." *Feist Publications, Inc. v. Rural Telephone Service Co., Inc.*, 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991). The plaintiff's registration of *Authoritas* with the U.S. Copyright Office "constitutes prima facie evidence of ownership and originality of the work as a whole." *Johnson v. Gordon*, 409 F.3d 12, 17 (1 Cir., 2005). Since the defendants have not challenged the validity of Greenspan's copyright in *Authoritas*, the first requirement for a copyright infringement claim is not at issue here.

■ The motions to dismiss address the second requirement, to wit, whether Greenspan alleges sufficient facts to establish, or from which it could plausibly be inferred, that the defendants copied his original work. This second element of a copyright infringement claim involves a two-step inquiry. *Airframe Systems, Inc. v. L–3 Communications Corp.*, 658 F.3d 100, 105–06 (1 Cir., 2011); *Situation Management Systems, Inc. v. ASP. Consulting LLC*, 560 F.3d 53, 58 (1 Cir., 2009); *Johnson*, 409 F.3d at 18. As explained by the First Circuit, in order to establish actionable copying:

> First, the plaintiff must show that copying actually occurred. This showing entails proof that, as a factual matter, the defendant copied the plaintiff's copyrighted material. Second, the plaintiff must establish that the copying is actionable by proving that the copying of the copyrighted material was so extensive that it rendered the infringing and copyrighted works substantially similar.

*Johnson*, 409 F.3d at 18 (internal citations and quotation marks omitted); *Airframe Systems*, 658 F.3d at 105; *Situation Management*, 560 F.3d at 58.

"In other words, '[n]ot all "factual" copying constitutes legally actionable copyright infringement'; the actual copying must be extensive enough to render the works 'substantially similar.'" *Airframe Systems*, 658 F.3d at 106 (quoting *Creations Unlimited, Inc. v. McCain*, 112 F.3d 814, 816 (5 Cir., 1997)).

In his complaint, Greenspan focuses on an account of a meeting involving Lawrence Summers ("Summers") in *The Accidental Billionaires* as being similar to an account of a meeting involving Summers in *Authoritas*. (# 1 ¶ 39) The plaintiff alleges a number of the similarities between the two accounts including descriptions of the reception area, the receptionist's conduct, Summers' office, Summers' conduct and manner, the appearance and conduct of Summers' assistant, and the response of the students in the meetings. (# 1 ¶ 43) Greenspan also contends that the account of Zuckerberg's statement in an Administrative Board hearing in the Film is similar to an account of his own frustrations in *Authoritas*. (# 1 ¶ 63) The question is whether the facts alleged in the complaint about these two incidents are sufficient to show or support a plausible inference that the defendants actually copied the plaintiff's work, and that such copying is actionable. *See Situation Management*, 560 F.3d at 58; *Johnson*, 409 F.3d at 19.

### i. Actual Copying

■ Greenspan may show actual copying through direct evidence of copying or through circumstantial evidence of (1) the defendants' access to the copyrighted work, and (2) the substantial similarity between the allegedly infringing and copyrighted works. *Johnson*, 409 F.3d at 18; *Lotus Dev. Corp. v. Borland Int'l, Inc.*, 49 F.3d 807, 813 (1 Cir., 1995), *aff'd*, 516 U.S. 233, 116 S.Ct. 804, 133 L.Ed.2d 610 (1996).

The plaintiff has alleged that *Authoritas* was published in June of 2008 and, therefore, was accessible to the general public. (# 1 ¶ 29) It is further alleged that defendant Mezrich contacted the plaintiff

regarding his knowledge of Facebook's origins and Greenspan responded by referring Mezrich to the website for *Authoritas.* (# 1 ¶¶ 32, 33) Lastly the plaintiff asserts that *Authoritas* is listed as a secondary source in the bibliography of *The Accidental Billionaires.* (# 1 ¶ 38) These alleged facts, taken as true, are adequate to show that the defendants enjoyed access to plaintiff's copyrighted work.

■ Probative similarity [5] requires that a "sufficient degree of similarity exists between the copyrighted work and the allegedly infringing work to give rise to an inference of actual copying." *Johnson,* 409 F.3d at 18; *Lotus,* 49 F.3d at 813. According to the First Circuit,

[t]he resemblances relied upon as a basis for finding probative similarity must refer to 'constituent elements of the [copyrighted] work that are original.' Thus, in examining whether actual copying has occurred, a court must engage in dissection of the copyrighted work by separating its original, protected expressive elements from those aspects that are not copyrightable because they represent unprotected ideas or unoriginal expressions.

*Johnson,* 409 F.3d at 18–19 (internal citations omitted).

Thus, the similarities between the protected elements in the copyrighted work and the allegedly infringing work must be examined.

Greenspan alleges, *inter alia,* [6] the following similarities between *Authoritas* and *The Accidental Billionaires:*

(1) The subtitle for *The Accidental Billionaires* includes the phrase "Founding of Facebook," similar to the use of "Founding of the Facebook" in *Authoritas.*

(2) The chapter headings "Harvard Yard" and "Veritas" in *The Accidental Billionaires* are similar to the chapter heading "The Cars of Harvard Yard" in *Authoritas* and exactly the same as the chapter heading "Veritas" in *Authoritas.*

(3) *The Accidental Billionaires'* account of students sitting in wait outside of

---

**5.** The First Circuit has had occasion to note that:

A copyright infringement claim may involve two different assessments of 'similarity'—one to determine whether copying in fact occurred and the other to evaluate whether it amounted to infringement—and we have observed that confusion has arisen from the "dual use of the term 'substantially similar' " to refer to both issues, *Yankee Candle Co. v. Bridgewater Candle Co.,* 259 F.3d 25, 33 n. 4 (1st Cir.2001); *see also Johnson,* 409 F.3d at 18; *Matthews v. Freedman,* 157 F.3d 25, 27 n. 1 (1st Cir.1998) (noting the two uses of '[t]he substantial similarity rubric'). In *Johnson,* we used distinct language for each, stating that the *fact* of copying may be proven inferentially if there is 'probative similarity' between the works at issue (accompanied by proof of access), i.e., "the two works are 'so similar that the court may infer that there was factual copying.' " 409 F.3d at 18 (quoting *Lotus Dev. Corp. v. Borland Int'l,* 49 F.3d 807, 813 (1st Cir.1995)). Copying as a factual matter is insufficient to prove infringement, however, giving rise to the second similarity question: whether the copying was sufficiently extensive to render the two works 'substantially similar,' and therefore actionable. *Segrets, Inc. v. Gillman Knitwear Co.,* 207 F.3d 56, 60 (1st Cir.2000). 'Th[is] substantial similarity requirement focuses holistically on the works in question and entails proof that the copying was so extensive that it rendered the works so similar that the later work represented a wrongful appropriation of expression.' *Johnson,* 409 F.3d at 18. *Mag Jewelry Co., Inc. v. Cherokee, Inc.,* 496 F.3d 108, 115 n. 7 (1 Cir., 2007).

**6.** Further examples alleged by Greenspan but not detailed herein are insufficient to demonstrate probative similarity between the protected elements of the plaintiff's work and the defendants' works.

Summers' office and the location of the office—"sitting next to each other on a couch that felt as old as Massachusetts Hall itself" . . . "[t]he entrance to the building was perpendicular to University Hall, where the legendary statute of John Harvard stood . . ."—is similar to the account in *Authoritas* of a student waiting and the office's location—"I was sitting on a plush beige sofa in an office in Massachusetts Hall, a small rectangular building lodged snugly next to Harvard Yard's Johnston Gate."

(4) In *The Accidental Billionaires* what a receptionist is said to have stated "The president will see you now," is similar to the woman in *Authoritas* saying, "The President will see you in a moment."

(5) The description of the furniture in Summers' office in *The Accidental Billionaires*—"There were bookshelves . . . a huge wooden desk . . . antique-looking side tables . . . an Oriental carpet . . . a Dell desktop computer"—is similar to the account in *Authoritas*—"There was a computer . . . on a desk . . . and the dark African masks resting on the shelves."

(6) Descriptions of Summers' assistant in *The Accidental Billionaires*—"a pleasant-looking African American woman". . . "who was dutifully taking notes"—is similar to the descriptions in *Authoritas*—"notebook in hand, ready to record my thoughts and emotional state". . . "an African–American woman."

(7) Descriptions of Summers in *The Accidental Billionaires*—"The disdain in Summers's voice was palpable" and "his chubby hand"—is similar to the description in *Authoritas*—"I had never observed such palpable impatience before" and "he was fat, chubby, and slow."

(8) The accounts of Summers' statements and manner in *The Accidental Billionaires*—"He . . . stared at the brothers with pure distaste in his eyes. 'Why are you here?' "; " 'So what do you want me to do about it' "; and "I don't see this as a university issue"—are similar to the accounts in *Authoritas*—" 'What can I do for you?'. . . His tone indicated that I was already being ridiculed"; " 'Well, Aaron, what do you want me to do?' "; and " 'I do not see the instance of disrespect here.' "

(9) The descriptions of the students' responses in the meeting with Summers in *The Accidental Billionaires*—"his face turning red"; "He felt . . . betrayed. By this man, by the system"; and "Tyler stared at the man in shock"—are similar to the descriptions in *Authoritas*—"setting my cheeks on fire"; "my hatred for the system"; and "I was shocked."

Complaint # 1 ¶ 43.

Greenspan also alleges that in the Film, the scene of the Administrative Board hearing in which Zuckerberg states, "As for any charges stemming from the breach of security, I believe I deserve some recognition from this Board" is similar to the account on page 270 of *Authoritas* where the plaintiff describes his offering of "proof that I had voluntarily informed the Admissions Office of multiple vulnerabilities in their systems." (# 1 ¶ 63)

■ It must first be determined what aspects of the examples above, if any, deserve copyright protection as the plaintiff's original expressions. *See Johnson*, 409 F.3d at 19. The determination of whether an element of a copyrighted work is an

216

original expression is for the court to decide. *Yankee Candle Co., Inc. v. Bridgewater Candle Co., LLC,* 259 F.3d 25, 34 n. 5 (1 Cir., 2001). "The originality requirement for copyright protection is not particularly rigorous. 'Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity.'" *Situation Management,* 560 F.3d at 60 (quoting *Feist,* 499 U.S. at 345, 111 S.Ct. 1282). Thereafter those protected elements must be compared against the defendants' works for probative similarity. *See Situation Management,* 560 F.3d at 59; *Johnson,* 409 F.3d at 19; *CMM Cable Rep, Inc. v. Ocean Coast Properties, Inc.,* 97 F.3d 1504, 1515 (1 Cir., 1996).

None of the expressions in (1) or (2) deserve copyright protection because the phrase "founding of" is a cliché expression conveying the origin of something, "Harvard Yard" is the name of a location, and "Veritas" is simply the Latin translation of the word "truth." Similarly, the statement "the president will see you," in (4) does not deserve copyright protection since it is a cliché expression used to convey the idea that an individual is ready for a meeting. Nor are the words "palpable" and "chubby" in (7) protected. Copyright protection does not extend to "'fragmentary words and phrases' and to 'forms of expression dictated solely at functional considerations' on the grounds that these materials do not exhibit the minimal level of creativity necessary to warrant copyright protection." *CMM Cable Rep,* 97 F.3d at 1519 (citations omitted).

"Ideas cannot be copyrighted." *Concrete Mach. Co., Inc. v. Classic Lawn Ornaments, Inc.,* 843 F.2d 600, 606 (1 Cir., 1988). Such protection would inhibit subsequent authors from building on or improving upon the ideas conveyed. *See Feist,* 499 U.S. at 349–50, 111 S.Ct. 1282; *see also Matthews v. Freedman,* 157 F.3d 25, 27 (1 Cir., 1998) ("[T]he underlying idea ... even if original, cannot be removed from the public realm; but its expression ... can be protected."). Facts cannot be copyrighted. *Feist,* 499 U.S. at 347, 111 S.Ct. 1282. Copyright law provides protection only to the author's original expression of such facts and ideas. *Feist,* 499 U.S. at 347, 111 S.Ct. 1282; *Johnson,* 409 F.3d at 19. Therefore, although the idea of sitting in wait for a meeting and the fact that Summers' office is in Massachusetts Hall in (3) are not protected, Greenspan's original expression using the couch and location of the building should enjoy copyright protection. The furniture in Summers' office described in (5) is an unprotected fact; however, the plaintiff's original expression of the facts through his choice to include particular details would enjoy copyright protection.

As to Greenspan's description of Summers' assistant in (6), the fact of her ethnicity is not protected; however, the plaintiff's original expression of the idea of an assistant taking notes should enjoy copyright protection. Regarding the plaintiff's accounts in (8), the fragmented phrases "what do you want me to do?" and "I don't see" are not protected; however, Greenspan's original expression of Summers' unwelcoming manner and inability to see the students' point of view would enjoy copyright protection. The idea of being upset at "the system" in (9) is not protected; however, Greenspan's original expression of such idea should enjoy copyright protection. Finally, the idea of being frustrated at anticipated punishment for exposing security flaws is not protected; however, the plaintiff's original expression of his frustrations should enjoy copyright protection.

The plaintiff's allegations in (3), (5), (6), (8), and (9), and his allegation of similarity between Zuckerberg's Administrative Board hearing and his own frustrations, taken as true, may demonstrate a sufficient degree of similarity to allow the Court to find that there is probative similarity between the defendants' works and the plaintiff's protected expressions. However, the "requirement of probative similarity is somewhat akin to, but different than, the requirement of substantial similarity that emerges at the second step in the progression." *Johnson*, 409 F.3d at 18. The question is whether the copying of *Authoritas* was sufficiently extensive to render the works "substantially similar," and therefore actionable. *Segrets, Inc. v. Gillman Knitwear Co., Inc.*, 207 F.3d 56, 60 (1 Cir.), *cert. denied*, 531 U.S. 827, 121 S.Ct. 76, 148 L.Ed.2d 39 (2000); *T–Peg, Inc. v. Vermont Timber Works, Inc.*, 459 F.3d 97, 112 (1 Cir., 2006).

### ii. Actionable Copying

Plaintiff must show actionable copying through evidence that the actual copying is " 'so extensive that it rendered the infringing and copyrighted works substantially similar.' " *Johnson*, 409 F.3d at 18 (quoting *Segrets*, 207 F.3d at 60; *Airframe Systems*, 658 F.3d at 105). As explained by the First Circuit,

> Substantial similarity between the copyrighted work and the allegedly infringing work is assessed by comparing the protected elements of the plaintiff's work as a whole against the defendant's work. The fact finder gauges this element by applying the ordinary observer test, under which substantial similarity is found if a reasonable, ordinary observer, upon examination of the two works, would conclude that the defendant unlawfully appropriated the plaintiff's protectable expression.

*Airframe Systems*, 658 F.3d at 106 (internal citations and quotation marks omitted). Put another way, "[t]he inquiry focuses not on every aspect of the copyrighted work, but on those aspects of the plaintiff's work [that] are protectible [sic] under copyright laws and whether whatever copying took place appropriated those [protected] elements." *T–Peg, Inc.*, 459 F.3d at 112 (internal citations and quotation marks omitted). An overall impression of similarity is not enough "[i]f such impression flows from similarities as to elements that are not themselves copyrightable." *Johnson*, 409 F.3d at 19.

■ The similarities in (3) and (6) stem from the underlying ideas rather than the expressions of such ideas. The idea of sitting in wait in Massachusetts Hall creates the impression of similarity between *The Accidental Billionaires* and *Authoritas*. It cannot be said that comparing the defendants' expression of that idea—conveying the age of the couch and the location of Massachusetts Hall based on its proximity to another building and a statute—with the plaintiff's expression—conveying the feel of the couch, the shape of Massachusetts Hall, and its location in proximity to Johnston Gate—that there was copying so extensive that an ordinary observer could conclude that the defendants unlawfully appropriated the plaintiff's expression. Likewise, the idea of an assistant taking notes and the fact of her ethnicity create the impression of similarity between the two works. However, the defendants' expression of the assistant taking notes of what is said in the meeting compared to the plaintiff's expression of the assistant seeing into his thoughts and emotions does not support a determination that the copying was so extensive that an ordinary observer could conclude that there was unlawful appropriation. So, too, the idea of being frustrated at the possibil-

ity of punishment for exposing flaws in a system creates the similarity between the Film's account of Zuckerberg's Administrative Board hearing and the account of the plaintiff's actions in *Authoritas*. However, it is not reasonable to believe that an ordinary observer could conclude that the expression of this frustration in the Film— Zuckerberg conveying it to the Board— was an unlawful appropriation of the plaintiff's expression in *Authoritas*—offering of proof that the plaintiff voluntarily disclosed the systems vulnerabilities to the Admissions Office.

Greenspan and the defendants express the facts of the layout of Summers's office in (5) through their choices to include certain pieces of furniture. However, the use of the desk, shelves, and computer fall within the doctrine of scenes a faire[7] as inherent characteristics of an office and thus do not lead to a plausible inference of infringement. The defendants' choice additionally to include antique-looking side tables and an Oriental carpet as compared to the plaintiff's expression including dark African masks undercuts any notion that the copying was so extensive that an ordinary observer could conclude that there was unlawful appropriation.

■ The substantial similarity inquiry also looks to the extent of copying from the copyrighted work. *Situation Management*, 560 F.3d at 58. " 'If the points of dissimilarity not only exceed the points of similarity, but indicate that the remaining points of similarity are, within the context of plaintiff's work, of minimal importance, either quantitatively or qualitatively, then no infringement results.' " *T–Peg, Inc.*, 459 F.3d at 112–13 (quoting 4 Nimmer & Nimmer, *Nimmer on Copyright*, § 13.03[B][1][a] (2006)). Although both

Greenspan and the defendants use similar phrases to express the idea of Summers' unwelcoming manner, his inability to see the students' point of view, and the students being upset at the system in (8) and (9), the five sentences that convey these ideas are quantitatively and qualitatively insubstantial in the context of *Authoritas* as a whole. Any copying claimed based on (8) and (9) simply was not so extensive that an ordinary observer could conclude that the defendants unlawfully appropriated the plaintiff's original expressions.

■ "[S]ubstantial similarity is assessed by comparing the protected elements of the plaintiff's work as a whole against the defendant's work." *Situation Management*, 560 F.3d at 59. Greenspan and the defendants use similar aspects to express the two different meetings with Summers, including describing the reception area, Summers' office, Summers' conduct and manner, Summers' assistant's appearance and conduct, and the students' responses in the meetings. However, there is no dispute that Greenspan's book and the defendants' works were describing two different meetings which took place at different times, involved different student participants and different subject matter. These meetings were but a very minimal part of the various works as a whole. In context, whatever similarity there may be, it is too quantitatively and qualitatively insignificant to be deemed "substantial." Greenspan has not alleged sufficient facts to establish that a reasonable, ordinary observer could conclude that the defendants unlawfully appropriated the plaintiff's original expressions.

■ For the reasons stated above, the plaintiff has failed to state a claim for

---

**7.** "[T]he doctrine of 'scenes a faire' denies copyright protection to unoriginal elements of recurring stock scenes." *Dunn v. Brown*, 517

F.Supp.2d 541, 545 (D.Mass., 2007) (citing *CMM Cable Rep.*, 97 F.3d at 1522 n. 25).

copyright infringement. Absent an actionable claim for direct copyright infringement, the claims for contributory or vicarious infringement must also fail. The Supreme Court has explained that:

> One infringes contributorily by intentionally inducing or encouraging direct infringement, see *Gershwin Pub. Corp. v. Columbia Artists Management, Inc.,* 443 F.2d 1159, 1162 (C.A.2 1971), and infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it, *Shapiro, Bernstein & Co. v. H.L. Green Co.,* 316 F.2d 304, 307 (C.A.2 1963). Although "[t]he Copyright Act does not expressly render anyone liable for infringement committed by another," *Sony Corp. [of America] v. Universal City Studios, [Inc.],* 464 U.S. [417], at 434, 104 S.Ct. 774[, 78 L.Ed.2d 574 (1984) ], these doctrines of secondary liability emerged from common law principles and are well established in the law, *id.,* at 486, 104 S.Ct. 774 (Blackmun, J., dissenting); *Kalem Co. v. Harper Brothers,* 222 U.S. 55, 62–63, 32 S.Ct. 20, 56 L.Ed. 92 (1911); *Gershwin Pub. Corp. v. Columbia Artists Management, supra,* at 1162; 3 M. Nimmer & D. Nimmer, Copyright § 12.04[A] (2005).

*Metro–Goldwyn–Mayer Studios Inc. v. Grokster, Ltd.,* 545 U.S. 913, 930–31, 125 S.Ct. 2764, 162 L.Ed.2d 781 (2005) (footnote omitted).

"As these definitions suggest, in order to hold a defendant secondarily liable someone else must have directly infringed on the copyright holder's rights." *Wolk v. Kodak Imaging Network, Inc.,* 840 F.Supp.2d 724, 750 (S.D.N.Y.2012) (citing *Faulkner v. Nat'l Geographic Enters., Inc.,* 409 F.3d 26, 40 (2 Cir.)) ("[T]here can be no contributory infringement absent actual infringement."), *cert. denied,* 546 U.S. 1076, 126 S.Ct. 833, 163 L.Ed.2d 707

(2005); *Matthew Bender & Co. v. West Publ'g Corp.,* 158 F.3d 693, 706 (2 Cir., 1998) (rejecting plaintiff's contributory infringement claim, in part, because the plaintiff "has failed to identify any primary infringer"), *cert. denied,* 526 U.S. 1154, 119 S.Ct. 2039, 143 L.Ed.2d 1048 (1999); *see also Elsevier Ltd. v. Chitika, Inc.,* 826 F.Supp.2d 398, 403 (D.Mass.2011). Counts I through III of the complaint shall be dismissed.

### B. Lanham Act Violations

Plaintiff's fourth claim is that the defendants used unfair competition and false advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a), in the marketing of *The Accidental Billionaires* and the Film. (# 1 ¶ 102)

The Lanham Act prohibits misleading representations in commercial advertising. *See* 15 U.S.C. § 1125(a). The First Circuit has delineated the cause of action:

> To prove a false advertising claim under the Lanham Act, a plaintiff must demonstrate that (1) the defendant made a false or misleading description of fact or representation of fact in a commercial advertisement about his own or another's product; (2) the misrepresentation is material, in that it is likely to influence the purchasing decision; (3) the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience; (4) the defendant placed the false or misleading statement in interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products.

*Cashmere & Camel Hair Mfrs. Institute v. Saks Fifth Ave.,* 284 F.3d 302, 310–11 (1 Cir.), *cert. denied,* 537 U.S. 1001, 123 S.Ct. 485, 154 L.Ed.2d 396 (2002).

■ To state an unfair competition claim, "facts supporting bad faith" must also be alleged. *Applera Corp. v. Michigan Diagnostics, LLC*, 594 F.Supp.2d 150, 163 (D.Mass., 2009). The plaintiff must allege facts sufficient to show that the defendants used misleading representations in the commercial advertising of *The Accidental Billionaires* and the Film that influenced consumers into purchasing those works, and that the plaintiff was damaged by the defendants' actions.

■ Greenspan contends that the defendants used misrepresentations in the commercial advertising by designating *The Accidental Billionaires* as nonfiction, by buying five-star reviews of *The Accidental Billionaires,* and by buying bulk purchases of *The Accidental Billionaires* to propel the book up the best-sellers list. (# 1 ¶¶ 96, 99, 100) The facts alleged to support the claim that referring to *The Accidental Billionaires* as nonfiction is a misrepresentation echo the facts alleged to support defamation, i.e., the defendants did not convey the plaintiff's role in the origins of Facebook.[8] (# 1 ¶ 98) The term nonfiction only means that the literature is based on true stories or events, not that every statement is in fact demonstrably true. *See,* e.g., wiki.answers.com/Q/What_does_non_fic-

tion_mean. Greenspan does not allege that *The Accidental Billionaire* is not based on true events.[9] The fact that the defendants designated *The Accidental Billionaires* to be nonfiction does not support a Lanham Act claim. To the extent it is alleged that the defendants compensated reviewers to gain 'five-star' reviews and made bulk purchases of *The Accidental Billionaires* to boost sales numbers, the allegations are conclusory.[10] (# 1 ¶¶ 99, 100) Moreover, there is no assertion that the purported misrepresentations made by the defendants, i.e., buying 'five-star' reviews and boosting sales numbers, influenced, or would likely influence, consumer purchasing decisions. Lastly, Greenspan has not alleged damage in a form recognized under the Lanham Act. There are no facts alleged that the defendants' misrepresentations harmed the plaintiff's business by causing the loss of sales or goodwill associated with its products. *See Cashmere,* 284 F.3d at 311. In short, Greenspan has failed to allege sufficient facts to establish a claim under § 43(a) of the Lanham Act.

## C. Defamation

The plaintiff's fifth claim is for defamation against the defendants for statements made in *The Accidental Billionaires,* omis-

---

8. To support the contention that *The Accidental Billionaires* is not a true story, Greenspan sets forth a list of purported errors in Schedule B to the complaint. These errors include things such as: the use of the wrong word in a computer science context, to wit, logarithms instead of algorithms; that Mark Zuckerberg lived in Kirkland House, not Eliot House; a misspelling of an individual's last name; the segment of the plaintiff's website was called "The Universal Face Book" and not "Universal House Facebook;" the statement that Greenspan got in trouble for his website when he was never officially reprimanded; and there was no bookshelf behind the president's desk in Massachusetts Hall. (# 1, Schedule B) These facts do not suggest that *The Accidental Billionaires* is not a nonfiction book.

9. Greenspan essentially only alleges that *The Accidental Billionaires* is not based on the plaintiff's version of the facts. Two books may both be designated as nonfiction even though they have contrasting accounts of the same events.

10. In ruling on a Rule 12(b)(6) motion, the court may only rely on the facts alleged or incorporated within the four corners of the complaint. *Rivera v. Centro Medico de Turabo, Inc.,* 575 F.3d 10, 15 (1 Cir., 2009). To the extent that the plaintiff proffers additional facts in his memorandum in opposition to the dispositive motions, those facts cannot be considered.

sions in *The Accidental Billionaires* and the Film, and for statements made by defendant Mezrich in a C–SPAN interview.

■■■ Under Massachusetts law, a claim of defamation requires Greenspan to show that the defendants are "at fault for the publication of a false statement of and concerning the plaintiff which was capable of damaging his or her reputation in the community and which either caused economic loss or is actionable without proof of economic loss." *Stanton v. Metro Corp.*, 438 F.3d 119, 124 (1 Cir., 2006). Thus, to survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege facts sufficient to establish that the defendants made "(1) a false and defamatory communication (2) of and concerning the plaintiff which is (3) published or shown to a third party." *Carmack v. National R.R. Passenger Corp.*, 486 F.Supp.2d 58, 76 (D.Mass., 2007) (citations and internal quotation marks omitted).

The plaintiff alleges that he is incorrectly referred to in *The Accidental Billionaires* as "Grossman" rather than Greenspan and also by the terms "kid" and "some kid," and that such references are pejorative. (# 1 ¶ 47) In the plaintiff's view, the reference to his website in *The Accidental Billionaires*, i.e., "hardly anyone had paid any attention to it ... And Grossman's site wasn't particularly slick," implied that his work was irrelevant and of poor quality. (# 1 ¶¶ 48, 107) Greenspan contends that the selective omission of his role in the origins of Facebook in *The Accidental Billionaires*, and the complete omission of his role in the Film, withheld from the plaintiff his proper recognition. (# 1 ¶¶ 50, 66, 69) Defendant Mezrich's repeated claims that *The Accidental Billionaires* is "true" by implication magnified the harm of the aforementioned references to, and omissions of, the plaintiff.[11] (# 1 ¶ 52) Lastly, the plaintiff asseverates that defendant Mezrich attributed false motives to Greenspan during the C–SPAN interview, a nationwide broadcast. (# 1 ¶¶ 74, 111) Greenspan alleges that these statements and omissions in *The Accidental Billionaires* and the Film were published to a wide range of persons in the public. (# 1 ¶ 112)

### i. Defamatory Meaning

■■■ It is not incumbent upon the court to determine whether the defendants' statements and omissions are defamatory, but rather only "whether the communication is reasonably susceptible of a defamatory meaning."[12] *Damon v. Moore*, 520 F.3d 98, 103 (1 Cir.) (alteration, citations and internal quotation marks omitted), *cert. denied*, 555 U.S. 939, 129 S.Ct. 175, 172 L.Ed.2d 241 (2008). This is a question of law to be determined by the court. *Phelan v. May Dept. Stores Co.*, 443 Mass. 52, 56, 819 N.E.2d 550, 554 (2004). A defamatory communication "would tend to injure the plaintiff's reputation, or 'hold the plaintiff up to scorn, hatred, ridicule or contempt, in the minds of any considerable and respectable seg-

---

**11.** Greenspan alleges that prior to *The Accidental Billionaires* and the Film, he had made progress in correcting the wrongs, i.e., the details about his dispute with Mark Zuckerberg over the plaintiff's involvement in Facebook's origins, that lead to his reputation being tarnished. (# 1 ¶ 76) The implication from the defendants labeling their works as nonfiction is alleged to have worked to reverse this progress. (# 1 ¶ 77)

**12.** However, "[w]here the communication is susceptible of both a defamatory and nondefamatory meaning, a question of fact exists for the jury." *Phelan v. May Dept. Stores*, 443 Mass. 52, 57, 819 N.E.2d at 550, 554 (2004) (citation and internal quotation marks omitted).

ment in the community.'" *Damon*, 520 F.3d at 103 (quoting *Amrak Prods., Inc. v. Morton*, 410 F.3d 69, 72 (1 Cir., 2005) (further citation omitted)). In determining whether the defendants' statements and omissions are susceptible of a defamatory meaning, "the communication must be interpreted reasonably, and can be ruled defamatory only if it would lead a reasonable reader to conclude that it conveyed a defamatory meaning." *Damon*, 520 F.3d at 104 (alteration, citations and internal quotation marks omitted). When undertaking the reasonable reader analysis, the statement alleged to be defamatory

> must be viewed in its totality in the context in which it was uttered or published and considering all the words used, not merely a particular phrase or sentence. . . . In making this determination, we must view [plaintiff's] interpretation of the communication reasonably, .and can only rule that it is defamatory if it could lead a reasonable viewer to conclude that it conveyed a defamatory meaning. . . . The words are to be read in their natural sense with the meaning which they would convey to mankind in general.

*Damon*, 520 F.3d at 104–05 (alteration, internal citations and quotation marks omitted).

■ The use of an incorrect name to refer to the plaintiff is not reasonably susceptible of a defamatory meaning. It simply is not reasonable to infer that a reader could interpret the incorrect reference as a communication regarding the plaintiff's role, or lack thereof, in Facebook's origins. References to Greenspan by an inaccurate surname would not tend to injure the plaintiff's reputation or subject the plaintiff to scorn, hatred, ridicule or contempt in the minds of readers.

■ Neither is use of the term "kid" to reference Greenspan reasonably susceptible of a defamatory meaning. The meaning generally conveyed with the term is a young person, which is, in its natural sense, not derogatory. It may be true that an interpretation of the term can be coupled with characteristics generally associated with people of a young age such as immaturity or inexperience. However, even those characteristics would not hold Greenspan up to scorn, hatred, ridicule or contempt by the community. Further, viewed in the context of the communication, the term "kid" is employed in *The Accidental Billionaires* to describe a number of students at Harvard University trying to build websites including all of the main characters in the book as well as college students in general. (# 40 at 4 and n. 4) It is not reasonable to infer that such reference could convey a defamatory meaning regarding the plaintiff's reputation to a reader.

■ The defendants' choice to omit the plaintiff's role in the origins of Facebook in *The Accidental Billionaires* and the Film is not reasonably susceptible to a defamatory meaning. Greenspan does not allege facts to show that because his role is not mentioned in either of the works, this omission gives rise to a plausible inference that a reasonable reader could conclude that the plaintiff was irrelevant in Facebook's origins.[13] However, assuming such inference were plausible, it is not reasonable to infer beyond that that a reasonable reader could conclude that this would hold

---

**13.** Indeed, Greenspan alleges that viewers of the Film would "lack[ ] any frame of reference needed to discover the facts involving Plaintiff's involvement." (# 1 ¶ 70) Further, the plaintiff does not contend that the public's unawareness of his role is damaging his reputation and career prospects, but rather that the damage was done when he, Greenspan, attempted to correct the record or dispel "misapprehensions." (# 1 ¶¶ 53, 78)

the plaintiff up to scorn, hatred, ridicule or contempt. Essentially Greenspan contends that the harm resulting from the omissions was that he was robbed of his proper recognition for his role in the origins of Facebook; that is not a claim of defamation. A reasonable reader could not conclude that the references to, and omissions of, the plaintiff in *The Accidental Billionaires* and the Film are susceptible of defamatory meaning. Consequently, it is not necessary to examine whether the references and omissions were of and concerning Greenspan.

### ii. Expressions of Opinion

■■■■ Defamation claims cannot be founded on expressions of opinion. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–40, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) ("However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." (footnote omitted)). However, a statement which on its face is an opinion may actually be an implied assertion of fact; a speaker cannot escape liability by couching the statement in terms of opinion. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990); *Levinsky's, Inc. v. Wal–Mart Stores, Inc.*, 127 F.3d 122, 127 (1 Cir., 1997). "[T]he relevant question is not whether challenged language may be described as an opinion, but whether it reasonably would be understood to declare or imply provable assertions of fact." *Phantom Touring, Inc. v. Affiliated Publications*, 953 F.2d 724, 727 (1 Cir.), *cert. denied*, 504 U.S. 974, 112 S.Ct. 2942, 119 L.Ed.2d 567 (1992). "The determination whether a statement is one of fact or opinion is generally considered a question of law." *Cole v. Westinghouse Broad. Co., Inc.*, 386 Mass. 303, 309, 435 N.E.2d 1021, 1025, *cert. denied*, 459 U.S. 1037, 103 S.Ct. 449, 74 L.Ed.2d 603 (1982); *Driscoll v.*

*Board of Trustees of Milton Academy*, 70 Mass.App.Ct. 285, 296, 873 N.E.2d 1177, 1187–88 (2007). The Massachusetts Supreme Judicial Court has written that:

In deciding whether statements can be understood reasonably as fact or opinion 'the test to be applied ... requires that the court examine the statement in its totality in the context in which it was uttered or published. The court must consider all the words used, not merely a particular phrase or sentence. In addition, the court must give weight to cautionary terms used by the person publishing the statement. Finally, the court must consider all of the circumstances surrounding the statement, including the medium by which the statement is disseminated and the audience to which it is published.'

*Cole*, 386 Mass. at 309, 435 N.E.2d at 1025 (quoting *Information Control Corp. v. Genesis One Computer Corp.*, 611 F.2d 781, 784 (9 Cir., 1980)).

■■■ The statements at issue in *The Accidental Billionaires*, in context, are: "Then the Greenspan kid had gone on to develop something called houseSYSTEM that had some social elements involved in it. Greenspan had even added a Universal House Facebook into his site, which Mark had checked out; hardly anyone had paid any attention to it, as far as Eduardo knew ... And Greenspan's site wasn't particularly slick, and wasn't about pictures and profiles. Mark's idea was really different." Ben Mezrich, *The Accidental Billionaires: The Founding of Facebook* at 80 (2009). "A simple expression of opinion based on disclosed or assumed nondefamatory facts is not itself sufficient for an action of defamation, no matter how unjustified and unreasonable the opinion may be or how derogatory it is." *Cole*, 386 Mass. at 313, 435 N.E.2d at 1027 (citation and internal quotation marks omitted); *see*

*also Lyons v. Globe Newspaper Co.*, 415 Mass. 258, 262, 612 N.E.2d 1158, 1161 (1993). However, "a cause of action for defamation may still be sustained where an opinion implies the allegation of undisclosed defamatory facts as the basis for the opinion." *Yohe v. Nugent*, 321 F.3d 35, 41 (1 Cir., 2003) (citation and internal quotation marks omitted); *Lyons*, 415 Mass. at 262, 612 N.E.2d at 1161.

■ Applying these principles, the qualifier, "as far as Eduardo knew," cautions the reader that the statement "hardly anyone had paid attention to it," is based on the extent of Eduardo's knowledge and not any undisclosed facts. *See Lyons*, 415 Mass. at 266, 612 N.E.2d at 1163 ("The logical nexus between the facts and the opinion was sufficiently apparent to render unreasonable any inference that 'the derogatory opinion must have been based on undisclosed facts.'" (quoting Restatement (Second) of Torts § 566, comment c, second par.)); *see also King v. Globe Newspaper Co.*, 400 Mass. 705, 713, 512 N.E.2d 241, 246 (1987), *cert. denied*, 485 U.S. 940, 108 S.Ct. 1121, 99 L.Ed.2d 281 (1988) and 485 U.S. 962, 108 S.Ct. 1227, 99 L.Ed.2d 427 (1988). Merely because a person signed up on a website does not necessarily mean that the person was paying attention to the website; whether or not anyone paid attention to Greenspan's site is a subjective inquiry not amenable to an objective true or false resolution. No reasonable reader would conclude that the statements in *The Accidental Billionaires* suggest an assertion of fact about the quality of the plaintiff's work.

■ Similarly, the statement "wasn't particularly slick" is a figurative and hyperbolic communication for which there is no objective evidence to prove or disprove its falsity. *Levinsky's*, 127 F.3d at 127 ("[A] statement normally is not actionable unless it contains an objectively verifiable assertion." (footnote omitted)). "'[R]hetorical hyperbole' and other types of 'imaginative expression' that writers use to enliven their prose" are protected. *Phantom Touring*, 953 F.2d at 727; *Levinsky's*, 127 F.3d at 128.

■ Defendant Mezrich's statements during the C–SPAN interview, in context, were: "There's been a lot of lawsuits, not just Eduardo and the Winklevosses. There's that other big one, there's this kid, who was involved in some sort of lawsuit, about the name 'face book.' I don't remember how that worked out. I stand by the books. And, you know, the things that people point out, like, this is a perfect example of it. It's a person who has a personal beef—with Zuckerberg or with Facebook, and they're bringing it out in the way they can in this conversation. It really has very little to do with my book." (# 1, Schedule A). A reasonable listener could not conclude that defendant Mezrich's statements during the C–SPAN interview implied an assertion of an undisclosed fact about the plaintiff's motives. Mezrich disclosed his knowledge about a lawsuit that took place between Greenspan and Zuckerberg as well as the fact that he did not remember the outcome. This is clearly the basis for Mezrich's opinion that Greenspan's motive for attacking *The Accidental Billionaires* was a desire to illuminate his side of the dispute with Zuckerberg. Whether or not this was the plaintiff's motive cannot objectively be proven as true or false. No claim for defamation is stated.

## V. Conclusion

For all of these reasons, it is ORDERED that the Motion Of Random House, Inc., Mezco, Inc., And Benjamin Mezrich To Dismiss With Prejudice (# 17) be, and the same hereby is, ALLOWED.

It is FURTHER ORDERED that Defendant Columbia Pictures Industries, Inc.'s Motion To Dismiss Complaint (# 22) be, and the same hereby is, ALLOWED. Judgment shall enter dismissing the complaint in its entirety.

