OMV Associates, L.P. *vs.* Clearway Acquisition, Inc., & others.[1]

No. 11-P-309.

Suffolk. February 10, 2012. - October 4, 2012.

Present: Kantrowitz, Berry, & Vuono, JJ.

*Contract,* Lease of real estate. *Landlord and Tenant,* Surrender, Use of premises. *Corporation,* Corporate disregard.

In an action brought in Superior Court by a landlord seeking recovery of unpaid rent on two commercial leases, the judge did not err in granting judgment notwithstanding the verdict in favor of one defendant, the corporate parent of the defendant lessee, where, even assuming the evidence showed that the corporate parent exercised pervasive control over the defendant lessee, evidence of a causal connection between that control and the plaintiff's injury was lacking; and where, although the evidence would support a finding of confused intermingling between the two corporate defendants from some perspectives, it did not support a finding of confused intermingling in relation to the plaintiff. [565-570]

In an action brought in Superior Court by a landlord seeking recovery of unpaid rent on two commercial leases, the judge did not err in granting judgment notwithstanding the verdict regarding the defendant's claim of surrender, where the evidence was insufficient, as a matter of law, to warrant the jury's finding that the plaintiff had accepted the defendant lessee's surrender, either expressly or impliedly, based on the plaintiff's rights under the parties' written lease. [570-573]

In the circumstances of an action brought in Superior Court by a landlord seeking recovery of unpaid rent on two commercial leases, the judge did not err in awarding the plaintiff lessor damages for use and occupancy against the corporate parent of the lessee. [573-574]

Civil action commenced in the Superior Court Department on November 6, 2001.

The case was tried before *Margot Botsford*, J.; motions for judgment notwithstanding the verdict were heard by her; and entry of judgment was ordered by *Thomas E. Connolly*, J.

*Marc D. Padellaro* for the plaintiff.

[1] Mirror Image Internet, Inc., and Fleet Bank.

*Benjamin S. Kafka* for Clearway Acquisition, Inc.

*Sean T. Carnathan* for Mirror Image Internet, Inc.

VUONO, J. The plaintiff, OMV Associates, L.P. (OMV), brought this action in Superior Court to recover unpaid rent on two commercial leases. OMV appeals from judgment notwithstanding the verdict entered in favor of the defendant, Mirror Image Internet, Inc. (Mirror Image), the corporate parent of the defendant lessee, Clearway Acquisition, Inc. (Clearway). The primary issue on appeal is whether there was sufficient evidence to hold Mirror Image liable, on a theory of corporate disregard, for amounts owed on the leases executed by Clearway. We also address cross appeals concerning proof of OMV's intention to accept Clearway's surrender of one of the leases, and the appropriate measure of damages on OMV's claim against Mirror Image directly, for use and occupancy.

We recount the facts from the record, taken in the light most favorable to OMV, as they pertain to OMV's corporate disregard claim, reserving additional facts bearing on the cross appeals for our discussion, *infra*. OMV, as owner of the Park Square Building at 31 St. James Avenue in Boston, entered into two commercial leases with Clearway Technologies, LLC (Clearway Technologies), in September, 1999, and March, 2000, for suites 925 and 912, respectively, both for five-year terms. At the time, Clearway Technologies was a start-up company engaged in creating software to improve business users' ability to use the Internet more efficiently. Mirror Image was developing a similar technology but had no involvement with Clearway Technologies when the leases for the Park Square Building were signed.

In late 2000, Mirror Image became interested in combining its technology with that of Clearway Technologies and set about to acquire Clearway Technologies. To that end, in January, 2001, Clearway Technologies created Clearway as a subsidiary, the stock of which was then purchased by Mirror Image through a series of transactions not pertinent here.[2] Clearway Technolo-

---

[2] In exchange for receipt of all of Clearway's common stock, Mirror Image transferred ten million shares of Mirror Image common stock to Clearway Technologies; the value of those shares was not determined, and they were not publicly traded at the time.

gies transferred most of its assets and all of its liabilities to Clearway. Mirror Image did not purchase the assets and liabilities of Clearway as part of the deal.

At the time of the acquisition, Clearway's Internet technology was not commercially viable and the company was close to insolvent, owing approximately $4.2 million to its creditors. Clearway received no cash infusion as part of the purchase but was provided with a $10 million secured loan from Mirror Image's parent, Xcelera, Inc., which Mirror Image guaranteed. The two leases with OMV were transferred from Clearway Technologies to Clearway, which the leases permitted in those circumstances, without OMV's authorization.

Upon learning of Mirror Image's acquisition of Clearway, OMV changed its internal records regarding the rental account from Clearway Technologies to Clearway. Throughout Clearway's tenancy, OMV addressed its invoices and correspondence to Clearway, and OMV's internal records listed Clearway as the tenant. Clearway paid the rent to OMV with checks from a Clearway bank account. OMV's property manager, Jennifer Cote, testified at trial that she received no rent checks from Mirror Image and that she sent the rent bills and default notices for the leased premises to Clearway and not Mirror Image. Cote also testified, however, that it was her impression that after January, 2001, Mirror Image was responsible for the leases.

Following the acquisition, Mirror Image and Clearway worked together to try to combine their technologies, and some of Mirror Image's employees began working at the Park Square Building. Cote testified that she observed that Mirror Image was occupying suite 925, and that a Mirror Image sign was posted near the entry of the suite. Mirror Image and Clearway combined their Web sites, and if Clearway were sought on the Internet, the user would be routed to the Mirror Image Web site. A Mirror Image document was introduced at trial describing Clearway as a division of Mirror Image, and a press release indicated that Mirror Image's Boston sales office was located at 31 St. James Avenue. The two companies shared the same president, chief financial officer, vice-president of engineering, and director of human resources. Most of the members of the board of directors for Mirror Image were on the board of Clear-

way as well. There was evidence of some confusion among the officers and employees of both companies concerning who worked for whom and which company did what. According to the respective corporate records, however, the boards conducted separate meetings, the two companies maintained separate bank accounts and payrolls, and Mirror Image maintained its separate offices in Woburn.

Following September 11, 2001, security at the Park Square Building was tightened and employees of the building's tenants were issued identification cards, which were then required to access the building. A Mirror Image employee requested that OMV provide such identification cards to some of its employees, to permit entry without the need to sign in with building security.

Ultimately, Mirror Image's plan to combine the two companies' technologies was unsuccessful, and its efforts to utilize Clearway's technology ceased. Clearway stopped paying rent to OMV for both suites after October, 2001. OMV brought this action against Clearway and Mirror Image seeking, among other things, to hold Mirror Image liable for Clearway's obligations under the leases pursuant to a theory of corporate disregard. Relevant here, OMV also sought to recover against Mirror Image directly on a claim for use and occupancy of suite 925. Among its defenses, Clearway maintained that OMV had accepted Clearway's surrender of the lease for suite 912 in October, 2001, thereby releasing Clearway from any further obligations on that lease.

The claims were tried to a jury. The jury found for OMV on its claim for corporate disregard against Mirror Image, but the judge allowed Mirror Image's motion for judgment notwithstanding the verdict as to that claim. The jury found for Clearway on its claim that OMV had accepted its surrender of the lease for suite 912; the judge allowed OMV's motion for judgment notwithstanding the verdict as to that claim. Finally, the judge entered findings in OMV's favor on its claim against Mirror Image for damages for use and occupancy of suite 925, as the jury did not reach that claim. A judgment encompassing the jury's verdict and the judge's orders on the postverdict motions was entered by a different judge on July 10, 2008. OMV filed this appeal, and Mirror Image and Clearway filed cross appeals.

1. *Corporate disregard.* When considering a motion for judgment notwithstanding the verdict, "the judge's task, taking into account all the evidence in its aspect most favorable to the plaintiff, [is] to determine whether, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, the jury reasonably could return a verdict for the plaintiff." *Phelan* v. *May Dept. Stores Co.,* 443 Mass. 52, 55 (2004) (citation omitted). The judge considers whether "anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn" in the plaintiff's favor. *Poirier* v. *Plymouth,* 374 Mass. 206, 212 (1978). We apply the same standard on review. *Phelan* v. *May Dept. Stores Co.,* 443 Mass. at 55.

The judge properly instructed the jury in accordance with *My Bread Baking Co.* v. *Cumberland Farms, Inc.,* 353 Mass. 614, 620 (1968). She explained that OMV had to prove either that there was active and pervasive control of the related business entities by Mirror Image, with fraudulent or harmful consequences from the inter-corporate relationship, or that there was confused intermingling of activity between Mirror Image and Clearway, and ambiguity in relation to OMV, about the manner and capacity in which the two corporations and their representatives were acting. In addition, the judge outlined the twelve factors from *Pepsi-Cola Metropolitan Bottling Co.* v. *Checkers, Inc.,* 754 F.2d 10, 15-16 (1st Cir. 1985), that the jury could consider as part of their inquiry.[3]

In granting Mirror Image's motion for judgment notwithstanding the verdict, the judge reasoned that, even assuming the evidence showed that Mirror Image exercised pervasive control

---

[3] "(1) [C]ommon ownership; (2) pervasive control; (3) confused intermingling of business assets; (4) thin capitalization; (5) nonobservance of corporate formalities; (6) absence of corporate records; (7) no payment of dividends; (8) insolvency at the time of the litigated transaction; (9) siphoning away of corporation's funds by dominant shareholder; (10) nonfunctioning of officers and directors; (11) use of the corporation for transactions of the dominant shareholders; and (12) use of the corporation in promoting fraud." *Attorney Gen.* v. *M.C.K., Inc.,* 432 Mass. 546, 555 n.19 (2000). The factors were listed to assist the jury, but their consideration is not a matter of counting. *Evans* v. *Multicon Constr. Corp.,* 30 Mass. App. Ct. 728, 736 (1991). "One examines the twelve factors to form an opinion whether the over-all structure and operation misleads." *Ibid.*

of Clearway under the first prong of the analysis, evidence of a causal connection between that control and OMV's injury was lacking. We agree. "[C]ontrol, even pervasive control, without more, is not a sufficient basis for a court to ignore corporate formalities." *Scott* v. *NG US 1, Inc.*, 450 Mass. 760, 768 (2008).

First, there was no evidence that Mirror Image used its intercorporate relationship with Clearway to perpetrate fraud on OMV. See *Greenery Rehabilitation Group, Inc.* v. *Antaramian*, 36 Mass. App. Ct. 73, 79 (1994) (buyer's corporate disregard claim futile due to lack of evidence of fraud or deception against seller for its representations about reliability of property's tenants); *TechTarget, Inc.* v. *Spark Design, LLC*, 746 F. Supp. 2d 353, 357 (D. Mass. 2010) (no allegations that parent's pervasive control of subsidiary was used to deceive or manipulate plaintiff). Cf. *Gopen* v. *American Supply Co.*, 10 Mass. App. Ct. 342, 344-345 (1980) (parent misrepresented subsidiary's assets to landlord in using subsidiary to sign lease and shield parent from liability for long-term commitment).

Nor was the evidence sufficient to causally link Mirror Image's arguably pervasive control of Clearway to OMV's injury, and certainly not in a manner that could be found grossly inequitable. See *Scott* v. *NG US 1, Inc.*, 450 Mass. at 768 (corporate disregard "requires a determination that the parent corporation directed and controlled the subsidiary, and used it for an improper purpose"). Rather, the evidence established that, as a result of acquisition by Mirror Image, Clearway, nearly insolvent at the time, received a $10 million loan from Mirror Image's parent, guaranteed by Mirror Image. This permitted Clearway to pay its creditors and stay afloat for several more months, as the two companies worked together to try to combine their technologies. When that effort failed and Clearway defaulted on the leases, Mirror Image was left owing approximately $9 million as guarantor of Clearway's loan.

In light of their over-all relationship, evidence that Mirror Image did not compensate Clearway employees who performed work for Mirror Image, or that Mirror Image did not pay Clearway for the use of the leased premises by some of Mirror Image's employees, could not reasonably be viewed as proof that Mirror Image siphoned away Clearway's funds or otherwise wrongly

used its control to cause Clearway's default on the leases. See *Birbara* v. *Locke*, 99 F.3d 1233, 1241 (1st Cir. 1996) (not a case of asset siphoning where parent bought subsidiary "knowing that it was insolvent and pumped a great deal of money into [it] to try to make it profitable again").

With regard to the second prong of the corporate disregard analysis, the judge specifically instructed the jury that they were to determine whether there was confused intermingling of activities and operations between Clearway and Mirror Image "in relation to the landlord, OMV," that caused injury. In entering judgment notwithstanding the verdict, the judge acknowledged there was evidence of confused intermingling between the two corporations, but ruled it insufficient to establish serious ambiguity about the manner or capacity in which they were acting, a factor that is required to disregard their separate corporate identities.

On appeal, OMV highlights evidence of confused intermingling that it claims the judge ignored. While we agree that the evidence would support a finding of confused intermingling from the perspective of certain employees of Clearway and Mirror Image, or even, perhaps, the public at large, the evidence did not support a finding of confused intermingling in relation to OMV. See *TechTarget, Inc.* v. *Spark Design, LLC*, 746 F. Supp. 2d at 357 (confused intermingling and pervasive control was not alleged to be used to deceive or manipulate the plaintiff).

First and foremost, the relationship between Clearway and OMV was established by the written lease agreements. We believe a contract-based relationship, where the parties are plainly identified and their rights and obligations clearly defined, is less likely to present the sort of rare situation that calls for corporate disregard in order to prevent gross inequity. For that reason, "[s]everal courts and commentators have suggested that it should be more difficult to pierce the [corporate] veil in a contract case than in a tort case." *Birbara* v. *Locke*, 99 F.3d at 1238, and authorities cited. Our cases reflect that view.[4] By contrast, the situation where a third party cannot discern which

---

[4]See, e.g., *Evans* v. *Multicon Constr. Corp.*, 30 Mass. App. Ct. at 737 (no corporate disregard where payment was sought pursuant to a subcontract); *Greenery Rehabilitation Group, Inc.* v. *Antaramian*, 36 Mass. App. Ct. at 79

of two or more related corporate entities is involved in a given transaction has more typically arisen in the context of a tort, rather than in a contractual relationship.[5]

Here, the evidence did not show that OMV was confused or misled as to the entity with which it contracted for payment of rent pursuant to the leases. It is undisputed that Mirror Image was not involved with Clearway at the time the leases were executed. Once Mirror Image purchased Clearway, there is nothing in the record indicating that Mirror Image misled OMV or manipulated corporate identities in relation to Clearway's obligations under the leases. See *TechTarget, Inc.* v. *Spark Design, LLC,* 746 F. Supp. 2d at 357 (parent did not acquire subsidiary until after contractual relationship with plaintiff began and, despite pervasive control, did not engage in any dubious manipulation of corporate identities relevant to the contractual relationship). Compare *Gopen* v. *American Supply Co.* 10 Mass. App. Ct. at 344.

Moreover, according to the record, the identities, rights, and obligations of the contracting parties to the leases remained unchanged over the course of Mirror Image's presence on the scene, despite Cote's stated impression to the contrary. See *Greenery Rehabilitation Group, Inc.* v. *Antaramian,* 36 Mass.

---

(no corporate disregard where plaintiffs knew, upon succeeding to a lease, that the corporate tenant, and not the tenant's fifty-percent shareholder, was the named and responsible lessee); *Saveall* v. *Adams,* 36 Mass. App. Ct. 349, 353-354 (1994) (plaintiffs who contracted with corporate defendant in purchasing property had no basis to pierce the corporate veil to reach corporation's sole stockholders); *Brick Constr. Corp.* v. *CEI Dev. Corp.,* 46 Mass. App. Ct. 837, 839-840 & n.5 (1999) (subcontract with general contractor precluded corporate disregard against property owner and its affiliates to pay for subcontractor's work); *Ray-Tek Servs., Inc.* v. *Parker,* 64 Mass. App. Ct. 165, 177 (2005) (plaintiffs knew their contract was with the corporation and not with the corporation's owner and sole shareholder, individually).

[5]See, e.g., *My Bread Baking Co.* v. *Cumberland Farms, Inc.,* 353 Mass. at 620-621 (conversion of plaintiff's display racks by convenience store owners); *Commonwealth* v. *Beneficial Fin. Co.,* 360 Mass. 188, 289-294 (1971), cert. denied, 407 U.S. 914 (1972) (consumer confusion as to true identity of loan company); *Bump* v. *Robbins,* 24 Mass. App. Ct. 296, 314-315 (1987) (corporate disregard allowed for business broker claim against corporate seller stemming from seller's misrepresentations); *Cahaly* v. *Benistar Property Exchange Trust Co.,* 68 Mass. App. Ct. 668, 677 (2007) (investors' claims against investment company and its affiliates), *S.C.,* 451 Mass. 343, cert. denied, 555 U.S. 1047 (2008).

App. Ct. at 79 (no basis to disregard corporate form for breach of lease where "plaintiffs knew that as buyers they were succeeding to a lease with a corporation and no other"). See generally *Gordon Chem. Co.* v. *Aetna Cas. & Sur. Co.*, 358 Mass. 632, 638-639 (1971) (insurance policy disclosed no intention to treat separate corporations as a single entity for insurance purposes, either when policy was entered into or subsequently). The evidence showed that until its default, Clearway paid the rent to OMV, drawn on Clearway's own account. OMV sent all correspondence concerning the leases to Clearway, and OMV changed the name of the lessee in its internal records from Clearway Technologies to Clearway when it received notice of the January, 2001, acquisition, but made no further changes to reflect its impression that Mirror Image became responsible for the leases. Compare *Attorney Gen.* v. *M.C.K., Inc.*, 432 Mass. 546, 557 (2000) (actions of plaintiffs showed that they were confused as to the entity that owned the property).[6]

OMV's evidence of confused intermingling between Mirror Image and Clearway, while showing that Mirror Image and Clearway shared certain employees and assets and worked together at the leased premises, did not support a reasonable inference that OMV, itself, was confused regarding the entity responsible for the leases. In particular, it was not reasonable to infer that OMV, an experienced commercial landlord, was misled by a Mirror Image sign at the entry of one of the suites or by information on the companies' Web sites. Nor was a finding warranted that Mirror Image's request for building identification cards confused OMV as to the party obligated to pay rent under the written lease agreements. See *Westcott Constr. Corp.* v. *Cumberland Constr. Co.*, 3 Mass. App. Ct. 294, 299 (1975) (related corporate entities may pool their resources for certain purposes without creating " 'serious ambiguity' as to which entity is acting" in a particular situation). "To be reasonable, the inference [or conclusion] 'must be based on probabilities

---

[6]The inquiry is distinct from the judge's finding, on OMV's claim against Mirror Image directly for use and occupancy, that OMV impliedly agreed to Mirror Image's use and occupancy of suite 925 from July, 2001, to March, 2002. The judge specifically found that the implied agreement between OMV and Mirror Image for use and occupancy did not extend to the obligations under the lease.

rather than possibilities and cannot be the result of mere speculation and conjecture.' " *Phelan* v. *May Dept. Stores Co.*, 443 Mass. at 55, quoting from *McEvoy Travel Bureau, Inc.* v. *Norton Co.*, 408 Mass. 704, 706 n.3 (1990). In the context of a sophisticated landlord seeking to recover rent from the corporate parent of the lessee on a written lease, we conclude that the requisite confusion of activities and operations, in relation to OMV, was not established by the kind of intermingling evidenced here.

In reaching this conclusion, we are also mindful that "disregard of the separate corporate identity is reserved for 'rare particular situations to prevent gross inequity.' " *Greenery Rehabilitation Group, Inc.* v. *Antaramian*, 36 Mass. App. Ct. at 79, quoting from *My Bread Baking Co.* v. *Cumberland Farms, Inc.*, 353 Mass. at 620. See *Attorney Gen.* v. *M.C.K., Inc.*, 432 Mass. at 555 ("doctrine of corporate disregard is an equitable tool" to be used "in rare situations . . . to avoid injustice"). The jury here were instructed accordingly, i.e., that the confused intermingling, in addition to causing OMV's injury, must be such that it would be grossly unfair or unjust to respect the corporate boundaries between Clearway and Mirror Image.

The evidence did not support the jury's verdict on that score. The fact that OMV took no action to protect itself, when it claims to have developed the impression that Mirror Image was responsible for the leases, cuts against a finding of gross inequity and unfairness in these circumstances. See *Greenery Rehabilitation Group, Inc.* v. *Antaramian*, 36 Mass. App. Ct. at 79 ("the fact that the plaintiffs took no pains to investigate the corporation and were conspicuously unconcerned about it" suggested an absence of gross inequity, in the case of a sophisticated assignee to a lease seeking corporate disregard as to the lessee). As in *Greenery Rehabilitation Group, Inc.* v. *Antaramian, supra* at 78, we think OMV here is attempting "to exact what in effect would be a guarantee" of the Clearway leases from Clearway's parent after the fact, a strategy the equities do not favor.

2. *Surrender of the lease.* Clearway cross appealed from the entry of judgment notwithstanding the verdict, in OMV's favor, on the jury's finding that OMV accepted Clearway's surrender of the lease for suite 912. The judge ruled that the evidence was

insufficient, as a matter of law, to warrant the jury's finding that OMV accepted Clearway's surrender, either expressly or impliedly, based on OMV's rights under the parties' written lease.

Introduced into evidence were two letters, which Clearway claimed constituted a surrender and an acceptance thereof. The first was an October 18, 2001, letter from Clearway to OMV, stating, in relevant part, that it was unable to pay for the leased space "beyond [a] few more months," and that "[o]ur only alternative is to give the space back to you and cancel both leases." With respect to suite 912, which at the time was under a sublease with Oxford Bioscience III Corp. (Oxford Bioscience), until February 28, 2002, Clearway went on to say: "[W]e suggest that you would assume the position of direct lessor for the sub-lease immediately." By letter dated October 19, 2001, Cote, on behalf of OMV, responded as follows:

> "I am in receipt of your letter dated October 18, 2001, and have forwarded it along to our legal counsel for review. Please inform Oxford BioScience that all future sublease rents should be submitted to my office, and these funds will be applied against the sublease charges on your rental account."

Evidence favorable to Clearway indicated that Oxford Bioscience paid rent between November, 2001, and February, 2002, to OMV directly. OMV stopped sending rent invoices to Clearway after February 28, 2002, when the Oxford Bioscience sublease expired. On March 1, 2002, OMV relet suite 912 to Oxford Bioscience directly, on a month-to-month basis, without notice to Clearway. Oxford Bioscience vacated suite 912 on July 15, 2002, but OMV failed to bill Clearway for rent after Oxford Bioscience's departure and never served Clearway with a notice of default. OMV did not include a claim against Clearway for unpaid rent for suite 912 until it filed its second amended complaint.

The jury were instructed that Clearway had the burden of proving a clear intention on the part of OMV to release Clearway from any further obligation under the lease. In granting OMV's motion for judgment notwithstanding the verdict, the judge observed that there was no evidence of an express ac-

ceptance of Clearway's surrender; on appeal, Clearway does not appear to contend otherwise. But Clearway challenges the judge's ruling that evidence of Clearway's conduct did not support a reasonable inference that OMV had accepted Clearway's surrender in October, 2001.

To begin, the judge properly rejected the written correspondence between Clearway and OMV as providing proof of an implied acceptance of Clearway's surrender. OMV's October 19, 2001, response to Clearway's surrender characterized Oxford Bioscience as a subtenant and made reference to applying the subtenant's rent payments to Clearway's rental account, thereby communicating OMV's position that Clearway remained the tenant on the lease. See *Atkinson* v. *Rosenthal*, 33 Mass. App. Ct. 219, 222 (1992) (notice to tenant that landlord would seek to relet the premises, "in effect for the tenant's account[, did not support] an inference of acceptance of surrender").

Clearway counters that the evidence of OMV's conduct was sufficient to establish OMV's acceptance of Clearway's surrender, despite OMV's October 19 response indicating otherwise. Clearway argues that OMV's acceptance may be implied from OMV reletting the premises on March 1, 2002, to Oxford Bioscience, without giving notice to Clearway. See *id.* at 221. (acceptance of surrender of a lease may come about inferentially, by substituting a new tenant). But the lease expressly authorized reletting the premises upon Clearway's default. "When a landlord relets in accordance with rights reserved in the lease, there is no acceptance of a surrender in the absence of expression of a clear intention to release the tenant." *Id.* at 222. As here, reletting the premises was "a course of conduct . . . foreseen in the lease which in this case governs the rights of the parties." *Ibid.* Given the express terms of the lease, and OMV's conduct in accordance with its rights thereunder, reletting the premises was insufficient to support an inference that OMV clearly intended to accept Clearway's surrender.

Furthermore, in light of Cote's October 19 letter to Clearway, we are hard pressed to view OMV's lapses in pursuing Clearway for the rent, once Oxford Bioscience's sublease ended, as supporting a reasonable inference that OMV had previously accepted Clearway's October 18, 2001, surrender. In that light,

OMV's failure to send Clearway invoices or a notice of default, or OMV's delay in bringing a claim, fell short of establishing OMV's clear intention to release Clearway from its obligations under the lease. It was Clearway's burden to prove OMV's clear intention to accept Clearway's surrender, and not OMV's burden to demonstrate, by aggressive pursuit of its remedies, that it had rejected the surrender.

3. *Use and occupancy.* The jury, having found Mirror Image liable for the rent under a theory of corporate disregard, did not reach OMV's alternate claim against Mirror Image to recover damages for use and occupancy of suite 925. Upon allowing Mirror Image's motion for judgment notwithstanding the verdict on the corporate disregard claim, the judge made findings of fact on the use and occupancy claim, ruling in OMV's favor and awarding damages in the amount of $29,039.06 for the period from February 1, 2002, to March 9, 2002.

Mirror Image challenges the judge's finding that Mirror Image occupied the space. According to Mirror Image, at best the evidence showed that a small number of its employees visited suite 925 on occasion to work with a much larger group of Clearway employees during the period when Clearway ceased to pay rent under the lease. But the judge found that between July, 2001, and March 9, 2002, some Mirror Image employees worked at the Park Square building "on a quite regular basis," based on evidence that the engineering teams of the two companies were working together during that period and that Mirror Image requested building identification cards from OMV to permit easier access to the leased premises for Mirror Image employees. The judge also found that Mirror Image had an implied agreement with OMV to use the premises, as evidenced in OMV's issuance of those identification cards to Mirror Image employees. Based on our review, those findings were not clearly erroneous. See generally *Kenner* v. *Zoning Bd. of Appeals of Chatham*, 459 Mass. 115, 119 n.3 (2011).

Mirror Image fails to persuade us that the damages for its use and occupancy should be reduced to account for the small number of Mirror Image employees using the premises in relation to those of Clearway. In measuring damages, the judge properly focused on OMV's inability to use the premises while Mirror

Image employees were there. See *Lowell Hous. Authy.* v. *Save-Mor Furniture Stores, Inc.*, 346 Mass. 426, 431 (1963) ("The basis of liability for use and occupation consists in the control over the premises which effectively deprives the new owner of the use of the property").

Based on the foregoing, we affirm the judgment dated July 10, 2008.

*So ordered.*