This dispute arose out of a breach of a promise to use grant funds advanced by Genentech, Inc. (Genentech) to produce a medical educational conference. In a prior action filed in California, Genentech obtained a substantial default judgment against two defunct corporations, Physician's Academy for Clinical and Management Excellence, Inc. (PA) and World Conference Holding Company, Inc. (WCH). In this action, Genentech sought to hold Vidar Jorgensen, a number of his companies, and a family trust liable for that judgment. After a lengthy bench trial, a judge of the Superior Court declined to apply the corporate disregard doctrine in favor of Genentech and rejected most of Genentech's claims. Judgment subsequently entered (1) domesticating the California judgment against PA and WCH; and (2) enforcing the California judgment against Arendal Management, Inc. (AMI), which the judge found to be the successor corporation to WCH. See G. L. c. 235, § 23A.
On appeal, Genentech argues that reversal is required because (1) the trial judge made several clearly erroneous findings of fact and misapplied the corporate disregard doctrine; (2) the judge improperly concluded that WC Research, Inc. (WCR) was not a mere continuation of AMI; and (3) the judge abused his discretion by excluding certain proposed exhibits.[3]
In their cross appeal, the defendants argue that the judge erred by enforcing the California judgment against PA, WCH, and AMI (as successor to WCH). Specifically, they maintain that because the California court lacked personal jurisdiction over PA and WCH, the judgment was void, and to enforce it against AMI, a nonparty, would violate principles of due process. We affirm the judgment in all material respects.
1. Background. Mindful of the deferential standard of review, we recite the relevant facts drawn from the judge's findings, supplementing them in part with undisputed facts.
a. Jorgensen corporations. A successful businessman and investor, Vidar Jorgensen founded or cofounded over thirty companies in the course of his long career. Six are relevant to this appeal. Created in 1996 by Jorgensen, WCH, a central services and cash management company, conducted operations primarily out of its Woburn, Massachusetts, office.[4] WCH provided services for a fee to a number of affiliated companies, including PA, WRG Research, Inc. (WRG), WCR, and the Center for Business Intelligence, Inc. (CBI) (hereinafter "affiliated companies").[5] WCH was designed not to make a profit, but to break even through a pro rata allocation of its expenses to the affiliated companies. When WCH encountered periodic cash flow problems, Jorgensen and his wife provided loans and cash infusions to keep the business going; and WCH paid Jorgensen and his wife a "salary" in order to repay some of these loans. Operations were suspended in 2009 due to lack of money.
Incorporated in 2006 for the purpose of obtaining grants to host medical conferences, PA conducted business out of a New York City office until shortly before it was closed in July, 2009. Jorgensen owned ninety percent of PA through the Staubo Trust III, a family trust found by the judge to be his alter ego. Lawrence Sherman, a recognized leader in the continuing medical education field, owned the remaining ten percent and served as PA's chief executive officer (CEO). Jorgensen was the president, treasurer, and a director of PA.[6]
During its three years of active operations, PA produced many medical conferences, including two for Genentech. From the very beginning, PA operated at a loss. PA only survived for as long as it did because of the cash management system, see infra at 5-6, delaying payment to creditors until intercompany loans from Jorgensen and affiliated companies (or CBI sales proceeds) were provided. Despite its lack of profitability, PA, through WCH, made intercompany transfers to other affiliated companies.
Jorgensen created AMI shortly before closing WCH in 2009. AMI took over WCH's offices and equipment. In addition, several WCH employees transferred to AMI where they continued to use the same accounting software to provide the same central services to affiliated conference companies (WRG and WCR) that WCH had provided to PA. There was evidence establishing that AMI assumed WCH's debts and responsibilities and that WCH's vendors were informed that effective January 1, 2010, WCH would be "changing its name" to AMI or would be operating under AMI. Jorgensen, the sole shareholder, closed AMI in 2012 because it was only servicing one company.
WRG and WCR were formed in 2000, shared CEOs (first Dharshan Wanasundera and then Jonathan Stock), and were also wholly owned by Jorgensen.[7] Although WRG and WCR were conference companies like PA, their financial model differed: company revenue was generated not through grants, but through fees charged to conference attendees, exhibitors, and sponsors. In 2012, Stock closed WRG, which was performing substantially the same services as WCR, and folded its operations into WCR. At the time of the trial, WCR, a profitable corporation, employed fifty individuals, including Jorgensen.
b. Business operations. At all times, the affiliated companies were operated under a shared services and centralized cash management manner of doing business. By sharing services, including human resources, information technology, accounting, payroll, and bill paying, the companies lowered their overall costs and overhead.
Pursuant to the cash management system, the unused cash reserves of one company were transferred to fund another's operations. As cash came in to a particular company, the money would be lent, through WCH, to other companies on an as-needed basis with the expectation of full repayment. The borrowed money covered costs necessary to keep the company running. The advantages of the system included the avoidance of bank fees, convenience, and short-term financing that would otherwise be unavailable. WCH managed all intercompany transfers and recorded all of them on each company's general ledger as "due to" and "due from." Made frequently, the loans were not memorialized in contracts and did not pay interest at relevant times. Both expert witnesses agreed that there was nothing inherently wrong or unusual about this method of conducting business.[8]
Each affiliated company had its own articles of incorporation, by-laws, bank account, books, and corporate records maintained primarily through WCH; and each company obtained independent auditors' reports, and filed its own tax returns and mandatory annual reports with the Massachusetts Secretary of State. However, no official director or shareholder meetings were held.
c. Genentech's grant. In December, 2008, PA requested funds to produce a continuing medical education conference on macular degeneration. Jorgensen was not involved in any way in PA's grant applications. Following approval by the grant committee, in early January 2009, Genentech sent PA a check in the amount of $633,223. The parties' letter agreement restricted the use of the funds to "general business operations" and the payment of conference vendors. Soon after deposit, the funds were loaned to other affiliated companies. In 2009, while PA was insolvent, approximately $900,000 was transferred to WCH, WRG, and WCR. At Jorgensen's direction, PA was closed in the summer of 2009 for lack of money. The medical conference was never held.
Other facts will be discussed as they relate to the issues raised on appeal.
2. Standard of review. In reviewing the judge's decision, this court is "bound by [his] findings of fact that are supported by the evidence, including all inferences that may reasonably be drawn from the evidence." Cavadi v. DeYeso, 458 Mass. 615, 624 (2011), quoting from Twin Fires Inv., LLC v. Morgan Stanley Dean Witter & Co., 445 Mass. 411, 420 (2005). Review of those findings is for clear error. See Kitras v. Aquinnah, 474 Mass. 132, 138 (2016). Accord Lily Transp. Corp. v. Royal Institutional Servs., Inc., 64 Mass. App. Ct. 179, 187-189 & nn.15 and 16 (2005) (concluding that the trial judge's piercing of the corporate veil was unwarranted as matter of law and on the facts of the case). The judge's rulings of law are reviewed de novo and his ultimate decision to deny equitable relief is reviewed for abuse of discretion. See Cavadi v. DeYeso, supra at 624.
Where, as here, the jurisdictional facts were undisputed, the susceptibility of the nonresident defendants (PA and WCH) to the jurisdiction of the California courts was a question of law subject to de novo review. See ViaView, Inc. v. Retzlaff, 1 Cal. App. 5th 198, 210 (2016).
3. Discussion. a. Corporate veil piercing. In order to succeed on its main claim of error, Genentech must convince us that this is one of those rare cases in which the trial judge was required to grant equitable relief "for the defeat of fraud or wrong, or the remedying of injustice." Scott v. NG US 1, Inc., 450 Mass. 760, 767 (2008), quoting from Hanson v. Bradley, 298 Mass. 371, 381 (1937). We are not persuaded.
General disfavor of the doctrine in this type of business dispute poses the first roadblock to Genentech's appeal. As the trial judge noted, our courts are less likely to apply the corporate disregard doctrine in contract cases. See OMV Assocs., L.P. v. Clearway Acquisition, Inc., 82 Mass. App. Ct. 561, 567-568 (2012) ; Birbara v. Locke, 99 F.3d 1233, 1238 (1st Cir. 1996) (Court of Appeals for First Circuit noted that the Supreme Judicial Court [SJC] had not applied the doctrine in a contract case). Moreover, Massachusetts has been somewhat stricter than other jurisdictions in maintaining the settled expectations about corporate separation.[9] See My Bread Baking Co. v. Cumberland Farms, Inc., 353 Mass. 614, 619-620 (1968) (My Bread Baking ).
At trial, Genentech proceeded solely under the first prong of My Bread Baking, supra at 619, the governing legal standard in corporate disregard cases. See Scott v. NG US 1, Inc., 450 Mass. at 768. To meet its burden of proof, Genentech was required to show that "there [wa]s active and direct participation by the representatives of one corporation [Jorgensen], apparently exercising some form of pervasive control, in the activities of another [here allegedly PA and WCH] and there is some fraudulent or injurious consequence from the intercorporate relationship." My Bread Baking Co., supra at 619. In Massachusetts, twelve factors are assessed in deciding whether this standard was satisfied.[10] See Evans v. Multicon Constr. Corp., 30 Mass. App. Ct. 728, 733 (1991) (Evans factors).
Here, as detailed in the judge's extensive findings, while some factors supported veil piercing, many did not. The judge carefully analyzed the Evans factors, acknowledging that some, including the observance of corporate formalities, had evidence going both ways. As the fact finder, the judge was entitled to conclude that the evidence weighed in favor of the defendants on these factors. Given the My Bread Baking theory under which Genentech proceeded, the judge was also entitled to give greater weight to the issue of pervasive control. See Evans v. Multicon Constr. Corp., supra at 736 (in analyzing the twelve factors, the "exercise is, of course, not one in counting").
Our review establishes that none of the judge's findings pertaining to the Evans factors was clearly erroneous.
To the extent that Genentech claims that the judge committed reversible error by ignoring two of the twelve Evans factors (the siphoning away of corporate assets by the dominant shareholders and thin capitalization), My Bread Baking sets the governing standard. No Massachusetts court has held that a judge must make factual findings on each Evans factor. Even assuming that all Evans factors should be addressed, see Lipsitt v. Plaud, 466 Mass. 240, 253 (2013), the judge's decision demonstrates that he met this standard.
First, the judge correctly recognized that his role was to "analyze [the] twelve factors" (emphasis added). His subsidiary findings demonstrate that he considered and implicitly found no improper siphoning of PA's assets by Jorgensen or the affiliated companies. For example, the judge found that as soon as Genentech's check cleared, the funds were loaned to other affiliated companies; and that notwithstanding its lack of profitability, PA did make a number of transfers through WCH to the other affiliated companies. However, as the judge found, WCH frequently made intercompany loans and transfers to pay bills as they became due. As Genentech itself noted, in 2009, all the affiliated companies were struggling and in need of money to pay their bills. The transfer of the grant proceeds out of PA was consistent with the usual course of WCH's business operations. In fact, PA had relied on the same cash management system (and loans from Jorgensen and other affiliated companies, and CBI proceeds) for its financial survival from the beginning.
The judge found, consistent with the evidence, no misuse of the corporations for personal reasons, see infra at 13-14. Jorgensen put a substantial amount of his own money into the unsuccessful affiliated companies to keep them operating and lost a net of approximately $2.2 million in PA. WCH paid Jorgensen and his wife a "salary" in order to pay back some of these loans. These were not the type of facts and inferences that would support a finding of asset depletion for the benefit of Jorgensen or the affiliated companies. See Birbara v. Locke, 99 F.3d at 1241 n.8 (rejecting siphoning claim based on lack of evidence of "subterfuge or channeling excessive payments" or evidence that the benefits paid to the defendants were not part of a legitimate benefits plan).
The judge did not "ignore" the evidence of thin capitalization, but rather found that "PA operated at a loss from the very beginning, and was only able to pay its creditors by delaying payment until it could receive inter-company loans from other affiliated companies and Jorgensen, and when it received some of the proceeds from the sale of CBI." The judge's findings appear to show that he credited the testimony of Genentech's expert witness on this matter.[11] The finding on this one factor, standing alone or in combination with other Evans factors, did not require the judge to disregard PA's corporate form.
Genentech has not shown that the finding in favor of the defendants on the eleventh Evans factor was clearly erroneous. After weighing the evidence, the judge found that with two minor exceptions, the corporations were not misused for the "numerous" transactions of the dominant shareholder.[12] Jorgensen did use one of the bank accounts managed by WCH to make wire transfers for personal reasons as well as for business reasons. Jorgensen testified that all transfers were properly recorded and charged to him personally. The judge ultimately concluded that "there was no evidence that the transactions were anything but repayment for business expenses, repayment for loans to the various companies or reclassification of debt to equity ...." The judge's finding that these transactions served no illegitimate purposes (or that Genentech had failed to prove otherwise) was warranted by the evidence.
The judge did not misapply the law governing pervasive control. See My Bread Baking Co., supra at 619. The test of pervasive control focuses on the transaction at issue, and requires a showing that the allegedly controlled corporation lacked "no separate mind, will or existence of its own." Scott v. NG US 1, Inc., 450 Mass. at 770-771, quoting from Fletcher, Cyclopedia of Corporations § 41.10, at 143-144 (rev. ed. 2006).
Here, the judge considered appropriate factors, focusing on Jorgensen's activities and involvement in the companies, particularly as they related to the injurious consequences that befell Genentech. See My Bread Baking Co., supra at 618. He found, with support in the evidence, that although Jorgensen was the dominant shareholder and an officer of most of his companies, "the overwhelming evidence showed that he had little to do with the day to day management of the companies"; the CEOs and other officers of his companies made most of the regular decisions; and the decisions and the strong suggestions in 2008 and 2009 that he made were the exception to the norm and fell within his authority as the director or primary shareholder.[13]
The evidence did show that Jorgensen, a director, became more involved in WCH out of necessity as well as in the affairs of PA when its continued existence was in doubt. However, given the limited extent of Jorgensen's participation, the judge was warranted in finding no compelling evidence of pervasive control over WCH and PA.
To the extent that Genentech claims that the judge's focus was improper in light of Jorgensen's "complete control over and misuse of corporate finances," the judge saw the facts differently. Jorgensen was rarely involved in WCH's mundane bill paying, which was handled at the controller level. Pointing out evidence in the record that was rejected by the judge is an ineffective way to satisfy the clearly erroneous standard. See Millennium Equity Holdings, LLC v. Mahlowitz, 456 Mass. 627, 637 (2010). The same principle holds true with respect to Genentech's challenge to the judge's finding that WCH and PA had fully functioning officers. Ibid.
The judge found, with evidentiary support, that "[t]here was some intermingling of funds taking the form of numerous intercompany loans facilitated by WCH, but-though it could have been done more carefully-the general ledgers kept track of all of the funds moving between companies."[14] There was nothing unusual or inherently wrong about WCH's centralized cash management services used by PA. The judge was not required to find that the "confused intermingling" of assets factor favored Genentech.
A significant amount of documentary and testimonial evidence was presented regarding the paper trail of money. Although the judge found that the accounting was not impeccable and the records could have been more clear, he chose not to draw an inference that the companies were "established or operated so as to misrepresent or divert assets." Evans v. Multicon Constr. Corp., 30 Mass. App. Ct. at 736. This finding that the corporate forms had not been used to perpetrate fraud was amply supported by the evidence.
The judge did not misapply the corporate disregard doctrine. Genentech was seeking a type of equitable remedy from the court that is rarely granted. Ultimately, Genentech was required to prove that the defendants used the corporate form to accomplish an improper purpose such as fraud. See Berger v. H.P. Hood, Inc., 416 Mass. 652, 657 (1993), quoting from Gordon Chem. Co. v. Aetna Cas. & Sur. Co., 358 Mass. 632, 638 (1971) ("It is only where the corporation is a sham, or is used to perpetrate deception to defeat a public policy, that it can be disregarded"); Scott v. NG US 1, Inc., 450 Mass. at 768, quoting from Evans v. Multicon Constr. Corp., 30 Mass. App. Ct. at 736 ("There is present in the cases which have looked through the corporate form an element of dubious manipulation and contrivance [and] finagling ..."); Evans v. Multicon Constr. Corp., 30 Mass. App. Ct. at 736 (twelve factors should be examined "to form an opinion whether the over-all structure and operation misleads"). Accord Kraft Power Corp. v. Merrill, 464 Mass. 145, 152 n.11 (2013). The judge was warranted in finding Genentech's evidence insufficient to make this showing.
The balancing of the equities did not so clearly favor Genentech as to require the use of the court's equitable powers. Genentech set the parameters by which it agreed to provide the grant funds, opting for a simple letter agreement between itself and PA. As the judge found, consistent with the evidence, the affiliated companies were open about their business and connections to each other. Financial statements, if requested by Genentech, would have established that PA operated at a loss from inception.[15] Before sending out the three checks to PA totaling over $1 million, however, Genentech, a sophisticated multi-billion dollar corporation, conducted no due diligence.[16] Flush with cash, it neither required program producers like PA to provide security nor required its grant funds to be escrowed.[17] These facts weighed against a finding of gross inequity to Genentech from the maintenance of the separate corporate forms of PA and WCH. See Greenery Rehabilitation Group, Inc. v. Antaramian, 36 Mass. App. Ct. 73, 79 (1994) ; OMV Assocs., L.P. v. Clearway Acquisition, Inc., 82 Mass. App. Ct. at 570.
In sum, the judge made appropriate findings of fact supported by the evidence and applied the correct legal standard to those facts. We discern no error or abuse of discretion in the judge's decision to not grant Genentech equitable relief.
b. Successor liability. Genentech argues that the judge erred by failing to continue the chain of corporate succession from WCH to AMI through to WCR. We disagree.
Generally, the debts and liabilities of a predecessor corporation are not imposed on a successor corporation that acquires its assets. See Guzman v. MRM/Elgin, 409 Mass. 563, 566 (1991). Four exceptions to the general rule of nonliability are recognized in Massachusetts.[18] Ibid. Creditors seeking to come within one of these exceptions must show a transfer of all or substantially all of the predecessor corporation's assets to the successor corporation. See Premier Capital, LLC v. KMZ, Inc., 464 Mass. 467, 475 (2013).
Here, the judge seemed to conclude that Genentech had failed to make this threshold showing, finding that "there [wa]s no evidence that any of A[MI]'s assets were ever transferred to either WRG or WCR such that they could be considered A[MI]'s successors." We agree with Genentech that there was indeed undisputed evidence of some asset transfer (such as the computer software). However, the judge's ultimate finding-that Genentech had failed to prove its claim by a preponderance of the evidence-was well supported by the evidence.
First, the record was devoid of evidence regarding the status of AMI's assets at the time it was shut down. Absent such evidence, the judge was unable to weigh the substantiality, if any, of the asset transfer. Even if this essential prerequisite was satisfied, the "mere continuation" theory of successor liability "envisions a reorganization transforming a single company from one corporate entity into another." Milliken & Co. v. Duro Textiles, LLC, 451 Mass. 547, 557 (2008), quoting from McCarthy v. Litton Indus., Inc., 410 Mass. 15, 21-22 (1991). In analyzing "mere continuation" claims, courts should focus "on whether one company has become another for the purpose of eliminating its corporate debt." Milliken & Co. v. Duro Textiles, LLC, supra at 556.
Here, in applying this standard, the judge could properly have concluded that Genentech did not meet its burden of proof. AMI, like its predecessor WCH, was an administrative, central services and cash management corporation. In contrast, WCR was a healthcare conference company. WCR did not carry on the operations of AMI under a new hat. See McCarthy v. Litton Indus., Inc., 410 Mass. at 22 ("[T]he imposition of liability on the [successor] is justified on the theory that, in substance if not in form, the purchasing corporation is the same company as the [predecessor] corporation").
The judge could properly have rejected Genentech's contention that the defendants shuttered AMI for an improper purpose (i.e., the avoidance of liabilities). As the judge found consistent with the evidence, AMI was closed in 2012 around the same time as WRG because it was servicing one company and "the costs became too much for so few services." With only one corporation in business (WCR), there was no longer a need for a separate central services company. Although WCR acquired some of AMI's assets and five of its employees, in light of the other findings, the judge was not required to find that WCR was AMI's successor.
c. Evidentiary issue. We discern no abuse of discretion in the allowance of the defendants' motion in limine precluding the admission of certain privileged documents.[19] See N.E. Physical Therapy Plus, Inc. v. Liberty Mut. Ins. Co., 466 Mass. 358, 363 (2013). The order requiring the defendants to produce these documents as a discovery sanction did not extend to their admissibility at trial. In the context of a subsequent ruling, the motion judge confirmed the limited nature of the privilege waiver. Even if the motion judge had deemed any and all privileges waived for all purposes, the trial judge had the authority to reconsider the ruling. See Riley v. Presnell, 409 Mass. 239, 242 (1991).
Moreover, as Genentech acknowledged below, irrespective of the privilege issue, it was also required to show that the statements of the defendants' former attorney appearing in these documents were relevant and admissible under the vicarious admissions exception to the hearsay rule.[20] See Ruszcyk v. Secretary of Pub. Safety, 401 Mass. 418, 420-423 (1988) (adopting Proposed Mass.R.Evid. 801[d][2][D] and 403, and requiring the satisfaction of a two-step inquiry for qualification). These issues were argued extensively to the trial judge at the oral argument on the motion in limine. In light of Genentech's failure to address any of the substantive evidentiary issues on the merits, we need go no further. See Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975) ("The appellate court need not pass upon questions or issues not argued in the brief").
Were we to reach the merits and even assuming the document was improperly excluded, we fail to see how the memorandum would have changed the result of the trial.
4. Cross appeal. In their cross appeal, the defendants challenge the enforcement of the California default judgment against PA, WCH, and AMI as the successor to WCH. Unless the defendants can demonstrate that the judgment of the California court was invalid, the judgment was entitled to full recognition and enforcement in the Commonwealth. See United States Constitution, art. IV, § 1 ; Bishins v. Richard B. Mateer, P.A., 61 Mass. App. Ct. 423, 428 (2004). Here, the defendants contend that the California judgment was void because the court lacked personal jurisdiction over PA and WCH.[21]
Applying the minimum contacts test, we conclude that PA's activity in California was of a sufficient quality and nature as to fairly and reasonably have required it to defend itself from Genentech's claims in a California court. See Epic Communications, Inc. v. Richwave Technology, Inc., 179 Cal. App. 4th 314, 327 (2009).
The facts advanced by Genentech satisfied the first two requirements of specific jurisdiction (purposeful availment and forum relatedness).[22] Ibid. The defendants in turn did not meet their burden of presenting a compelling case as to why, based on other factors, the assumption of jurisdiction would be unjustified. See id. at 336. PA could reasonably have anticipated that if failed to produce a medical conference as promised, it might be haled into a California court.
Although WCH was not a party to the grant contract, in light of its relationship to PA and independent minimum contacts with California, we reach the same conclusion.[23]
There was no due process concern in extending the California default judgment to AMI. Under the doctrine of claim preclusion, parties and their privies are barred from relitigating the same claims, including those adjudicated by a default judgment. See North Atl. Distrib., Inc. v. Teamsters Local Union No. 430, 497 F. Supp. 2d 315, 320 (D. R.I. 2007). The defendants do not challenge the judge's factual finding, amply supported by the evidence, that AMI was a mere continuation of WCH under a different name. See Milliken & Co. v. Duro Textiles, LLC, 451 Mass. 547, 557-558 (2008). The enforcement of the judgment against AMI, as the successor corporation to WCH, did not offend due process principles. See Wolf Metals Inc. v. Rand Pac. Sales Inc., 4 Cal. App. 5th 698, 704-705 (2016).
AMI was held liable here as a successor corporation, not as an alter ego or on a veil piercing theory. Thus, cases refusing to hold nonparty alter egos liable for previous default judgments have no application.
Judgment affirmed.

Genentech waived all other claims as well as its appeal from the denial of its postjudgment motion to reconsider, alter, or amend the judgment.

Jorgensen was the president, treasurer, secretary, and a director of WCH, and its sole shareholder.

In 2008, Jorgensen sold CBI, the profitable flagship company, for $30 million. The judge found that instead of keeping his share of the millions of dollars generated by the sale, Jorgensen used the proceeds to pay many of the affiliated companies' debts (including those of PA).

Jennifer Morales, a human resources specialist for the affiliated companies, served as the secretary and a director of PA.

Jorgensen was the president, secretary, treasurer, and director of both WRG and WCR.

On this point, the judge found that "[t]hroughout the life of these companies, Harold Newburg acted as auditor and financial consultant. He and Genentech's expert, Keith Lowey, testified regarding the general state of the various companies' finances, the completeness and accuracy of the general ledger[s], the accounting practices, the intercompany loans, the repeated cash infusions from Jorgensen and later from the sale of CBI, and generally demonstrated to the Court where much of the money was coming from, where it was going and why." The judge found that "while the companies attempted to accurately record each transaction, their accounting was often confused and incomplete."

To prove that Jorgensen was the alter ego of PA and WCH, Genentech was required to come within one of the limited exceptions to bedrock corporate law principles. See My Bread Baking Co. v. Cumberland Farms, Inc., 353 Mass. 614, 618 (1968) (corporations are generally regarded as separate from their stockholders); Scott v. NG US 1, Inc., 450 Mass. at 766 ("[C]orporations-notwithstanding relationships between or among them-ordinarily are regarded as separate and distinct entities").

Originating in Pepsi-Cola Metropolitan Bottling Co. v. Checkers, Inc., 754 F.2d 10, 14-16 (1st Cir. 1985), the Evans factors were first recognized by the SJC in Attorney Gen. v. M.C.K., Inc., 432 Mass. 546, 555 & n.19 (2000). See Lipsitt v. Plaud, 466 Mass. 240, 252-253 (2013).

Asked about his opinion of PA's initial capitalization, Keith Lowey, a certified public accountant, testified that PA had significant losses "from the very beginning"; and the initial money put in ($900,000) clearly was not sufficient to cover them.

The judge found that the "only evidence" regarding the "salary" of Mrs. Jorgensen, a nonemployee, was that it constituted repayment for a loan to WCH. That finding was clearly erroneous to the extent that it covered her "salary" after repayment of her loan in full in 2008. According to Jorgensen, one-half of his own "salary" was attributed to his wife for purposes of tax sheltering. Jorgensen had no knowledge of the credit card issued to one of his sons, and there was no further evidence introduced on the issue. In all events, given the totality of the evidence and the burden of proof, neither Mrs. Jorgensen's "salary" nor the undeveloped facts about the credit card required a finding in Genentech's favor on this Evans factor.

The judge's subsidiary findings and the undisputed facts supported his ultimate finding regarding the absence of pervasive control. He found that WCH had two different CEOs (Dharshan Wanasundera and Jon Stock) who were responsible for day-to-day operations and three chief financial officers (CFOs), Jay Sun, Joseph Canty, and Tim Hockey; and that Jorgensen was often in contact with his CEO and CFO about WCH's operations. Jorgensen, who was involved in around ten companies and traveled frequently, testified that he was not involved in the "very routine administrative business" of WCH. Regarding PA, the judge found that "there was testimony that he had very little to do with PA"; Jorgensen's involvement included participation in conference calls with PA's management team; making "strong suggestions and recommendations" about cutting costs designed to save PA (some implemented, and some not); directing, after Wanasundera left WCH (in August, 2009), which PA invoices to pay out of necessity and asking Sherman and Wanasundera to attempt to sell PA. The evidence established that PA's CEO, Lawrence Sherman, and PA vice president Mary Deering, were responsible for PA's personnel decisions, the setting of salaries and policies, the creation of budgets, financial projections, and business development. In contrast, Jorgensen, who lives and works in Woburn, testified that he was not familiar with the particular business of PA and, as corroborated by the testimony of Jennifer Morales and controller Joseph Canty, that he was not involved in its day-to-day operations. While Genentech focused its veil piercing arguments against WCH and PA, the evidence also established that Stock, the CEO of WCR, was responsible for all its operational matters, and made substantial personal loans to it.

This finding established that the judge considered the issue of confused intermingling as part of his analysis of the Evans factors. See Scott v. NG US 1, Inc., 450 Mass. at 768. The judge properly noted that Genentech had waived any claim under the second prong of My Bread Baking.

The timing of Genentech's grant could not have been any worse. During the same week that the funds were provided, Sherman announced layoffs and across the board pay cuts. Jorgensen questioned Sherman's decision to go on a family vacation when he was starting 2009 "materially behind in his projections" and "the very existence of PA was in doubt."

Genentech did not require the disclosure of basic financial information about PA, did not visit its offices, did not request references, and did not perform any credit checks.

Genentech provided $40 to $50 million in grant funding annually.

Genentech proceeded solely under a mere continuation theory of liability.

The trial judge excluded Genentech's proposed exhibits 4, 11, 21, 61, 86, and 186-189. In its brief, running up against the maximum page limit, Genentech confined its argument to the allegedly improper exclusion of exhibit 61. We deem any claims of error relating to the other exhibits waived. See Abate v. Fremont Inv. & Loan, 470 Mass. 821, 833-834 (2015).

The judge interpreted the previous orders, as we do, to render the privileged documents "admissible for purposes of discovery but not for purposes of the trial." He summarily concluded that the documents "would not be admissible." Genentech's attorney did not request further explanation for the ruling.

PA and WCH were defaulted for failing to appear in this action. Genentech claims that the defendants may not raise jurisdictional arguments belonging to PA and WCH, two companies it claimed were not predecessor corporations to AMI and WCR. In any event, AMI, alleged and found to be WCH's successor, had standing to challenge the personal jurisdiction of the California courts over WCH.

For example, PA solicited eight grant requests from Genentech, which maintains business offices in California and processed all grant requests through those offices. PA successfully obtained grants from Genentech on three of these occasions. PA executives, Lawrence Sherman and Daniel Wray, flew out to California in order to discuss PA with Genentech's medical education department. Sherman and Wray also communicated with Genentech's medical education department in California about the grant in issue in this case by telephone and emails. PA developed a marketing plan to promote the program to California residents. The contract breached by PA that gave rise to the causes of action against PA and WCH was to be performed in part at two California locations. Finally, PA retained a local California doctor to serve as a faculty member at the Los Angeles site.

WCH conducted no outside for-profit operations, but rather served as the de facto central services and cash management division of the affiliated companies. In that capacity, WCH was directly involved in the events giving rise to this dispute, implementing all of the intercompany transfers out of PA challenged by Genentech. Additionally, WCH was registered to do business in California. Although the defendants contend that WCH forfeited its registration status on May 15, 2008 (before Genentech and PA entered into the letter agreement), their contention is not supported by the exhibit purporting to establish this fact. Jorgensen, as the president of WCH, "irrevocably" consented to service of process on WCH in the State of California through a designated agent. WCH filed corporate tax returns and employed California residents.